**Jocelyn TOMPKIN, Executrix,
et al., Plaintiffs,**

v.

**AMERICAN BRANDS, INC.,
et al., Defendants.**

Nos. 5:94 CV 1302, 174, 184, 188.[1]

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 3, 1998.

---

1.  The Liggett Group missed the summary judgment filing deadline, which was April 10, 1998. On April 23, 1998, Liggett filed a motion for leave to file its summary judgment motion instanter. The summary judgment motion was attached to the motion for leave. Therefore, when leave was granted on April 29, 1998 the accompanying summary judgment motion was immediately filed by the clerk. (Docket No. 184). Thereafter, Liggett filed a duplicate motion for summary judgment. (Docket No. 188, filed on May 1, 1998). This was accompanied by a separate volume of Exhibits (Docket No. 189) which purported to be "in support of" Liggett's summary judgment motion. Since the motion filed on May 1, 1998 appears to be the complete motion, it is that one which has been considered by the Court. Docket No. 184 is denied, for record purposes, as moot.

896

Michael E. Ciccolini, Germano, Rondy & Ciccolini, Akron, OH, A. Russell Smith, R. Bryan Nace, Laybourne, Smith, Gore & Goldsmith, Akron, OH, for plaintiffs.

Mary M. Bittence, Diane P. Chapman, Wade A. Mitchell, Baker & Hostetler, Cleveland, OH, Walter L. Cofer, Craig E. Gustafson, Lucy E. Mason, John R. Fraser, Shook, Hardy & Bacon, Kansas City, MO, for Philip Morris Incorporated, defendant.

Robert D. Monnin, Hugh Kevin McNeelege, Thompson, Hine & Flory, Cleveland, OH, Thomas P. Meaney, Jr., Kenneth J. Walsh, Eric E. Kinder, Tyler Lee Mathews, McDonald, Hopkins, Burke & Haber, Cleveland, OH, James V. Kearney, Francis K. Decker, Jr., Patrick J. Carty, Jeffrey M. Goodman, Latham & Watkins, New York, NY, Marc E. Kasowitz, Marie V. Santacroce, Michael M. Fay, Kasowitz, Benson, Torres & Friedman, New York, NY, for Liggett Group, Inc. fka Liggett & Myers, Inc., defendant.

Walter L. Cofer, Craig E. Gustafson, Kansas City, MO, Samuel R. Martillotta, Mansour, Gavin, Gerlack & Manos, Cleveland, OH, Patrick M. McLaughlin, John F. McCaffrey, McLaughlin & Caffrey, Cleveland, OH, Lorillard Tobacco Company, Lorillard, Inc., defendants.

David S. Cupps, J. Scott Jamieson, Vorys, Sater, Seymour & Pease, Columbus, OH, Thomas E. Riley, David Wallace, Danielle Pareja Langhoff, Chadbourne & Parke, New York, NY, for American Tobacco Company, defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court are the following motions:

(1) motion for summary judgment on behalf of defendants The American Tobacco Company, Phillip Morris Incorporated, Lorillard Tobacco Company and Lorillard, Inc. (Docket No. 174 with Affidavit/Report, Docket No. 183);[2] and

---

2. Plaintiff's response to the motion is Docket No. 191 and defendants' reply is Docket No. 195.

(2) motion for summary judgment on behalf of defendant Liggett Group Inc. (Docket No. 188 with Exhibits, Docket No. 189).[3]

For the reasons discussed below, both motions for summary judgment are GRANTED.

## I. BACKGROUND

On February 2, 1998, plaintiff Jocelyn Tompkin, individually and as executrix of the estate of David Tompkin, filed her Third Amended Complaint (hereafter, "Complaint")[4] against The American Tobacco Company (by its successor by merger Brown & Williamson Tobacco Corporation); Philip Morris, Incorporated; Liggett Group, Inc., fka Liggett & Myers, Inc.; Lorillard Tobacco Company, fka P. Lorillard Co.; and Lorillard, Inc.[5]

Count One of the Complaint sets forth all of the party information and further alleges that from 1950 through 1966, plaintiff's decedent smoked various brands of cigarettes manufactured and sold by the defendants.[6] Plaintiff's decedent corrected this allegation at depositions taken for use at trial. He testified that he quit smoking in 1965, not 1966. (Tompkin Deposition of November 8, 1994 [hereafter "First Dep."],[7] at 28; Tompkin Deposition of November 18, 1994 [hereafter "Second Dep."],[8] at 10).

Count Two of the Complaint sets forth a claim for strict products liability alleging that the relevant cigarettes presented "a risk ... more dangerous than a reasonable consumer would have expected[ ]" (Compl.¶ 13), "were in an unsafe and defective condition at the time they left the possession of each of the Defendants[ ]" (Compl.¶ 14), "were purchased and used by David Tompkin without substantial change in the condition in which they were in [sic] when manufactured and sold by Defendants[ ]" (Compl.¶ 15), were defective "as a result of the Defendants' failure to provide adequate warnings regarding the health consequences of cigarette smoking[ ]" (Compl.¶ 16), and "were also defective in that [they] caused addiction and dependency." (Compl.¶ 17).

Count Three sets forth a claim for negligent, wilful and wanton "fail[ure] to adequately warn of the adverse health consequences of cigarette smoking[,]" (Compl.¶ 2), including "cancer, heart disease, and other adverse health consequences." (Compl.¶ 19). It is alleged that this negligence included "the manner in which [defendants] tested, researched, sold, promoted, and advertised the cigarettes that they manufactured and sold." (Compl.¶ 20).

Count Four sets forth a claim for fraud and misrepresentation "in the manner in which [Defendants] advertised their cigarette products in that they failed to give any warnings regarding the adverse consequences of smoking in the advertisements for their cigarette products, and in fact, represented and advertised their cigarette products as healthful products that could be used without any fear of adverse consequences." (Compl.¶ 23). This count further alleges that these representations were made "for the sole purpose of inducing Decedent to purchase their cigarettes[,]" (Compl.¶ 24), that the decedent re-

---

3. Plaintiff's memorandum in opposition is Docket No. 196 and defendant's reply is Docket No. 197.

4. The original Complaint was filed on June 24, 1994. At that time, decedent David Tompkin was still alive; he was joined in the lawsuit by his wife Jocelyn who sued for loss of consortium. Mr. Tompkin died on February 12, 1996. (Compl.¶ 46). There appears to be no dispute that the cause of his death was lung cancer. There *is* a dispute over whether that cancer was caused by smoking the defendants' cigarette products.

5. Plaintiff sought leave to file the Third Amended Complaint. On January 30, 1998, leave was granted and the Clerk filed the complaint accompanying the motion on February 2, 1998. *See*

Docket No. 156. Subsequently, plaintiff filed a duplicate of the Third Amended Complaint on February 4, 1998. (Docket No. 161).

6. Defendant The American Tobacco Company is alleged to have manufactured and sold Herbert Tareyton and Pall Mall cigarettes. (Compl.¶ 6). Defendant Phillip Morris, Inc. is alleged to have manufactured and sold Philip Morris cigarettes. (Compl.¶ 7). Defendant Liggett Group, Inc. is alleged to have manufactured and sold Chesterfield cigarettes. (Compl.¶ 8). Defendants Lorillard, Inc. and Lorillard Tobacco Company are alleged to have manufactured and sold Old Gold and Kent cigarettes. (Compl.¶ 9).

7. This deposition is filed at Docket No. 182.

8. This deposition is filed at Docket No. 181.

lied to his detriment upon the representations in various advertisements (Compl.¶ 25), and that the decedent would not have used the cigarette products if he had known the representations were false (Compl.¶ 24).

Count Five sets forth a claim for strict liability for misrepresentation, alleging that defendants' products "were defective as they did not conform to the Defendants' representations concerning the character, quality and safety of the cigarettes[.]" (Compl.¶ 27).

Count Six sets forth a claim for breach of express warranty, alleging that "Defendants expressly warranted that smoking the cigarettes that they manufactured and sold did not present any significant health consequences[ ]" (Compl.¶ 29) and that this warranty was breached in that the cigarettes "in fact caused cancer and other severe adverse health consequences, including death." (Compl.¶ 30).

Count Seven sets forth a claim for breach of implied warranty, asserting that "Defendants impliedly warranted that [their] products were merchantable and fit for the ordinary purposes for which they were used and Decedent relied upon such implied warranties." (Compl.¶ 32). This count further alleges that defendants "knew and should have known that David Tompkin was relying upon each of the Defendants' skills and judgments to select and furnish a suitable product[.]" (Compl.¶ 33).

Count Eight sets forth a claim of conspiracy and concerted action alleging that defendants, "in possession of medical and scientific data that indicated that the use of their cigarettes were [sic] hazardous to the health of consumers since at least 1950, but prompted by pecuniary motives, . . . individually and as members of the tobacco industry, ignored and failed to act upon that . . . data and conspired and acted in concert to deprive the public . . . of that . . . data[.]" (Compl.¶ 36). This concerted action was allegedly undertaken by the defendants in their capacity as members of The Tobacco Institute (Compl.¶ 37) and The Council for Tobacco Research USA, Inc. (Compl.¶¶ 38–39).

Count Nine sets forth a claim for damages resulting from David Tompkin's having been diagnosed with bronchogenic carcinoma. (Compl.¶ 43). Count Ten is a claim for wrongful death brought on behalf of his estate. (Compl.¶¶ 46–47). Count Eleven is a loss of consortium claim brought by Jocelyn Tompkin. (Compl.¶ 49).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). *See, e.g.,* *U.S. v. Hodges X–Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ." *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation,* 497 U.S. 871,

888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mutual Life Assurance Co. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548 (equating the standard for judgment as a matter of law under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18

L.Ed.2d 577 (1967) (*per curiam*) and *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

### III. DISCUSSION

The claims set forth in the ten substantive counts of the Complaint [9] can be grouped for purpose of this discussion into the following: (A) product liability claims (Counts Two through Seven); (B) claim of common law fraud (Count Four); (C) claim of conspiracy and concerted action (Count Eight); and (D) derivative claims (Counts Nine, Ten and Eleven).

Further, although two motions for summary judgment have been filed, the arguments made in each motion are substantially the same. The Court sees no need to lengthen this Memorandum Opinion by separately discussing each motion. The discussion below will apply with equal force to all defendants.

### A. Product Liability Claims (Counts Two through Seven)

Ohio's Product Liability Act ("the Act"), Ohio Rev.Code §§ 2307.71–2307.80, which governs product liability claims filed on or after January 5, 1988, applies to several of plaintiff's claims.[10] The Act states that a "product liability claim" is any claim for:

---

**9.** Although paragraphs 1 through 10 of the Complaint are styled as "Count One," they really only set forth the parties and which cigarette brands were manufactured by each defendant.

**10.** In the Memorandum Opinion and Order dated January 27, 1995 (Docket No. 45), this Court

concluded, contrary to plaintiff's argument, that the Act governs many of the claims in this lawsuit "because plaintiffs did not discover Mr. Tompkin's injury until after [January 5, 1988], even though the alleged cause of the injury (i.e., smoking the allegedly defective cigarettes) oc-

[D]eath, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:

(1) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

(2) Any warning or instruction, or lack of warning or instruction, associated with that product;

(3) Any failure of that product to conform to any relevant representation or warranty.

Ohio Rev.Code § 2307.71(M). Under this definition, Counts Two through Six of plaintiff's Complaint are governed by the Act.

■ Count Seven, the claim for breach of implied warranty, will be dismissed without further discussion since under *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 320, 364 N.E.2d 267 (1977), this common law product liability theory no longer exists separate and apart from the product liability theory of strict liability. Count Seven fails to state a theory of recovery recognized by Ohio law.

■ Defendants argue that § 2307.75(E) bars defect claims for products whose risks are "common knowledge." This section of the Act provides:

A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising

the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

Defendants further rely upon § 2307.76(B) of the Act to bar any failure to warn claim. This section provides:

A product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge.

Early in this case, the defendants moved this Court to dismiss plaintiff's claims on essentially the same grounds. In the Memorandum Opinion and Order of January 27, 1995,[11] this Court concluded that applicability of the Act to plaintiff's claims "does not automatically lead to the conclusion" that the claims are barred by the "common knowledge" theory. *Id.* at 899.[12] At that time, the Court was ruling on a motion to dismiss, where the standard is significantly different from the standard on a motion for summary judgment. Further, the facts then before the Court were that Mr. Tompkin stopped smoking in *1966*, which would have been after the effective date of the Federal Cigarette Labeling and Advertising Act, Pub.L. No. 89–92, 79 Stat. 282 (codified as amended at 15 U.S.C. §§ 1331–1340).[13] In that context, the Court concluded:

... It is not inconceivable that [Mr. Tompkin] will present testimony that he [stopped smoking in 1966] precisely because, for the first time, the federal government required a warning on each cigarette package that smoking *may* be

curred prior to the effective date of the Act." *Id.* at 7.

**11.** Three years later, to the day, plaintiff sought leave to file the Third Amended Complaint presently before this Court. *See* Docket No. 155.

**12.** At that time, the Court also stated, without analysis or discussion, that it "does not accept defendants' assertion that the principles of Comment *i* to Section 402A of the Restatement (Second) of Torts are codified in the Act." Memorandum Opinion and Order, Jan. 27, 1995, at 7. Defendants do not now raise the Comment *i* argument (although plaintiff's brief in opposition to summary judgment does). The Court herein

makes clear that it has not yet found a need, in any case before it, to exhaustively analyze whether Comment *i* is codified in the Act and has, therefore, not reached a conclusion on that issue, which it saves for another day. *See e.g., Jones, et al. v. The American Tobacco Company, et al.,* Case Nos. 5:97CV0593/0594 at 18–22, —— F.Supp. ——, 1998 WL 466623 (N.D. Ohio April 23, 1998).

**13.** The Labeling Act became effective on January 1, 1966 and had the stated purpose of assuring that the public would be informed "that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes[.]" 15 U.S.C. § 1331.

hazardous to one's health.[5] He may present testimony that it was at that time that he first became knowledgeable of the fact that smoking might harm his health in some way. In other words, Mr. Tompkin may present testimony that, although he had been smoking for more than 15 years without being aware of any danger to his health, once he was told by way of the warning label that his health *might* be in danger, he quit smoking.

5. The Labeling Act was amended on April 1, 1970. Pub.L. No. 91–222, 84 Stat. 87. The precise nature of the warning was made much stronger. Whereas the initial statute mandated a warning that "Smoking *May* Be Hazardous to Your Health," the statute as amended required a warning that "The Surgeon General Has Determined That Cigarette Smoking *Is* Dangerous to Your Health." 15 U.S.C. § 1333 (emphasis added).

Memorandum Opinion and Order, Jan. 27, 1995, at 10–11 (emphases and footnote in original). The Court further concluded as follows: "Factually it *may* eventually prove true that Mr. Tompkins [sic] did know at that time that smoking was dangerous, but it cannot be said at this juncture that such conjecture must, *as a matter of law*, be true." *Id.* at 11–12 (emphases in original).

Since the time of the ruling on the motions to dismiss, both fact and expert discovery has

been conducted.[14] Mr. Tompkin was deposed twice prior to his death and questioned extensively. As a result, the case is now in a significantly different posture than it was in January of 1995. Facts that were not available to the Court in 1995 are now available and those which are material and undisputed have been considered.

In its ruling of January 27, 1995, the Court wanted to remain open to the possibility that, if Mr. Tompkin could show that he never thought smoking was harmful *until* he saw the warnings on cigarette packages, a reasonable fact-finder might view this fact as proof that there really was at that time no "common," that is, universally-shared, knowledge that smoking was dangerous. The Court thought there was a possibility that such knowledge, if it existed at all, only became firmly established as "common" knowledge once the Surgeon General and the United States Congress took the strong position expressed in the Labeling Act. This door of opportunity for Mr. Tompkin closes, of course, now that it has been established that he stopped smoking before the Labeling Act took effect and, therefore, could not have been persuaded to quit smoking by the contents of any warning label.[15]

This Court is, therefore, back to the threshold question of whether it was "com-

14. Magistrate Judge Hemann has been supervising this case for pretrial purposes. The Court is aware that, by Order dated May 7, 1998 (after the filing of the motions for summary judgment), the fact discovery deadline was extended to July 13, 1998 and expert discovery was scheduled for completion by mid-September, 1998, both at the request of the parties. The Court recalls that Judge Hemann permitted the extensions, with the Court's approval, only after all parties agreed that all discovery necessary for the resolution of the motions for summary judgment had already been completed. Therefore, no party can now be heard to argue (nor can anyone argue on appeal) that summary judgment was resolved prior to completion of discovery resulting in prejudice to such party.

15. The Court anticipates that plaintiff will argue that Mr. Tompkin could have quit smoking after the Labeling Act was passed but before it became effective. The thrust of this argument would be that he was aware of the Act's passage even if he never actually saw a label on his cigarette packages. Even if the plaintiff were to make this argument, which she has not, the Court would

not be persuaded that this is enough to establish a material factual dispute in light of the following testimony at Mr. Tompkin's deposition:

Q. After you quit in 1965, did you ever have the opportunity to observe your wife's cigarette packs?
A. Yes.
Q. Have you ever noticed the warning label that appears on cigarette packs?
A. Yes.
Q. *What does the warning label say?*
A. *Something from the Surgeon General, something or other.*
Q. *Can you be more specific? Doesn't it, in fact, say cigarette smoking may be dangerous to your health?*
A. *That's possible.*

(First Dep. at 83). It is clear from this testimony that up to the very date of his deposition, Mr. Tompkin was not certain what was on the warning label on cigarette packs. Therefore, the argument simply cannot be made that the Labeling Act, or any publicity prior to its effective date, specifically brought the dangers of smoking to Mr. Tompkin's attention and motivated him to quit.

mon knowledge" between 1950 and 1965, when Mr. Tompkin smoked, that smoking was hazardous to one's health. If it was "common knowledge," the Act bars the defect and failure to warn claims.

Expert testimony is available from both the plaintiff's expert and the defendants' expert. This testimony does not reflect a material factual dispute on the "common knowledge" question.

An affidavit and report (Docket No. 183) filed by Professor Joan Hoff, defendants' expert,[16] supplies clear testimony regarding the "common knowledge" related to the dangers of cigarette smoking. She states, generally, that "[her] research has convinced [her] that there is no other product in the history of the western world that has been so vilified as dangerous to human health and habit forming and yet so universally used." (Hoff Report,[17] at 2–3).

The following excerpts from Professor Hoff's report illustrate the nature of the public's knowledge on the dangers of smoking:

1) [O]nce James I declared in 1604 that a smoker was as likely to give up tobacco as a drunk was to give up alcohol and denounced tobacco as "lothsome to the eye, hatefull to the nose, harmfull to the braine, [and] dangerous to the Lungs," other heads of state followed suit. . . . Almost all non-medical prescriptive literature and widely quoted statements about tobacco from the seventeenth through the nineteenth centuries have been negative. [p. 3]

2) Medical opinion about tobacco was not initially as uniformly negative [as the non-medical literature] because Native Americans and Latin American Indians used the product for medicinal purposes. . . . [However], by the middle of the eighteenth century in the United States and abroad the medical profession seriously began to question the health benefits of tobacco. In 1761, for example, tobacco was first linked to cancer by an American doctor and in 1798 Benjamin Rush wrote the first serious *secular* anti-tobacco tract connecting it with causing not only health problems, but

excessive drinking. By the time of the passage of the Pure Food and Drug Act in 1906, tobacco was not included among the regulated drugs because doctors no longer thought it had medicinal powers. [pp. 3–4]

3) At the turn of the century newspapers in Ohio reflected [anti-smoking] views and reinforced already existing common knowledge about the health dangers and habit forming aspects of tobacco. For example, both the *Cincinnati Post* and *Akron Beacon Journal* reported around 1900 that Cincinnati had established a House of Refuges for young boys who smoked and refused to go to school, that doctors were becoming concerned about the cigarette habit and the health of children, that women's clubs in Norwood and other cities joined together to "exterminate the cigarette evil" in their respective towns, and that the Pennsylvania Railroad forbade its trainmen and other employees from smoking on the job. Many groups opposed the sale of "coffin nails," "cancer sticks," and "little white slavers" to minors in violation of the law, and these terms continued in regular use and can be found in films and the mass media well into the 1950s and 1960s. [p. 6]

4) By 1936 the Ohio Department of Education was regularly publishing detailed syllabi for all Health and Physical Education classes from grades seven through twelve which included detailed discussion points about the harmful health effects of tobacco. . . . [A]fter World War II . . . Ohio health text books [began] to include examples of why girls, as well as boys, should avoid the smoking habit. Since the 1930s this instructional injunction had been reenacted by the state legislature in 1953, 1970, 1975, 1978, and 1980. No school child educated in Ohio would have been able to avoid such instruction for the entire twentieth century. [p. 7]

5) After World War II, all major Ohio newspapers (including the *Akron Beacon Journal* ) published the same anti-smoking information in the 1950s and 1960s that

---

**16.** Professor Hoff is a professor of history and the Contemporary History Institute, Ohio University. She has twenty-five (25) years of teaching and research experience as a historian. Plaintiff has not challenged Professor Hoff's credentials as an expert in this case.

**17.** This report is attached to Docket No. 183.

was in keeping with the uniform national media coverage about the dangers of tobacco use. Headlines in the Akron newspapers, for example, proclaimed: "U.S. Warns of Cigaret [sic] Cancer Link," and "Cigarets DO Cut Life's Length." [p. 7]

6) [I]n the 1940s such well-known newspapers and popular magazines as *the New York Times, Readers Digest, Life, Scribner's, Saturday Evening Post, Newsweek,* and *Time,* began to publish the results of scientific medical reports about lung cancer and smoking. *Readers Digest* was unusually influential in conveying such information because it had the largest national circulation during the decades before and after the Second World War, and it condensed the results of these reports so that Americans could readily understand them. [p. 8]

7) Beginning in the late 1930s physicians began to report that most of their lung cancer patients were cigarette smokers. Two of them, Drs. Alton Ochsner and Michael DeBakey, concluded in 1939 and 1941 that cigarette smoke might cause lung cancer after a latency period of about twenty years.... In 1954 the media widely reported on a study of 187,788 men by Hammond and Horn, demonstrating a statistical link between heavy smoking and lung cancer.... After appointing a task force in 1956 to look at the early statistical reports linking smoking with lung cancer, Surgeon General Leroy Burney proclaimed in 1957 that smoking was *"the principal* factor in the increased incidence of lung cancer." [pp. 8–9]

8) *Reader's Digest* repeatedly made these highly technical, scientific anti-tobacco reports understandable to millions of ordinary Americans, often augmenting them with statements by well-known individuals and common folk who had quit smoking because of its health risks or authors who had written how-to-quit smoking books.... [T]he Wallaces [founders] turned *Reader's Digest* into the most widely read anti-tobacco publication in the United States with such attention getting headlines as "Cancer by the Carton." It could be found not only in the homes of millions of Americans, but also in often frequented places like public reading rooms, bars, union meeting halls, hotel lobbies, barber shops, beauty parlors and, most significantly, doctors and dentists offices. [pp. 9–10]

9) It became next to impossible to be a literate American in the 1950s and not be aware of the numerous scientific reports and government statements linking smoking to lung cancer. Throughout the decade, TV coverage reinforced longstanding negative common knowledge about the health dangers of tobacco. [pp. 10–11]

10) [B]y the summer of 1954 almost ninety (89.9) percent of the general public had "heard or read [something] recently to the effect that cigarette smoking may be cause of cancer of the lung." [p. 11]

11) By the summer of 1957 almost eighty percent had heard about or read the American Cancer Society's Report linking lung cancer with smoking. [p. 11]

12) As early as 1960, ninety-seven percent of all high school students believed that there was a connection between lung cancer and smoking[.] [p. 11]

(Professor Hoff's Report, pages as indicated). Thus, Professor Hoff's affidavit and report establish that, in her opinion, it has long been common knowledge that smoking cigarettes is dangerous to one's health.

The testimony of plaintiff's expert witness, Dr. Elizabeth M. Whelan, does not controvert Professor Hoff's testimony. Dr. Whelan was questioned about Gallup and Roper polls conducted during the 1950s regarding the awareness of the risks of smoking. She testified as follows:

Q. What were the conclusions that were reached? Can you identify specific polls and tell me the conclusions?

A. The Gallup and Roper Polls seemed to ask the question: have you heard about a link between cigarettes and lung cancer? And the numbers were always very, very high.

Q. And this was during the 1950s?

A. By the late '50s.

Q. So it would be accurate to say at least the great majority of Americans, adults, at least had heard of the claimed link between smoking and lung cancer during the 1950s, is that accurate?

A. Yes.

(Whelan Dep. at 247). Dr. Whelan, however, stated that she did not find the polls very helpful. She expanded on that as follows:

Q. Do you recall any polls which asked whether people thought or believed that cigarette smoking was dangerous to their health?

A. Yes, I believe there were some polls on that, and questions directed at smokers and nonsmokers.

Q. Isn't it true that in those polls, the results of those polls reflected that the great majority of people polled thought or believed that cigarette smoking was dangerous to their health?

A. Yes. But you can believe that something is dangerous to your health in a generic way but not understand the specifics, so I am very unconvinced by the polls that there was common knowledge about the specifics of smoke as they related to oneselves or one's life.

\*   \*   \*   \*   \*   \*

... it was not common informed knowledge. It was like a ... popular wisdom. But it carried no real seriousness to it because I don't—my understanding of how the media reported on it, you would have no clue as to the dimensions of the seriousness of this problem. And as far as I know, people thought cigarette smoke was simply as dangerous as

breathing city air. I have no notion, no reason to believe from those polls that they did have general knowledge on the dangers of cigarettes as the scientists understood it at the time.

Q. The average person in the 1950s, as I understand your testimony, had some belief or understanding, not based on scientific knowledge but a belief or understanding that smoking was dangerous, but they didn't appreciate the relative risks, is that what you are saying?

A. They probably considered cigarettes dangerous and drinking alcohol dangerous and processed food, and it would be all in the same category, as far as I could tell. . . .

(Whelan Dep. at 248–250).[18]

Plaintiff's brief does nothing to challenge any of Professor Hoff's testimony. Further, plaintiff interprets Dr. Whelan's testimony as standing for the proposition that there was *no* common knowledge of the dangers of smoking because "there is no reason to believe that people in the 1950s had knowledge of the true dangers of smoking cigarettes as the scientists understood them at that time." (Plaintiff's Memorandum in Opposition at 4).

Plaintiff also attempts to rely on a report of Dr. Whelan dated October 15, 1997.[19] This report, however, does not support plaintiff's argument. To the contrary, it acknowledges several facts: (1) that as early as 1927, F.E. Tylecote observed that almost all lung cancer patients were smokers (Whelan Report at 1);[20] (2) that in 1939, Drs. A. Ochs-

18. Dr. Whelan also testified that she made no attempt in her research to determine the level of credibility which the public attached to each of the various sources of information regarding the health risk of smoking. (Whelan Dep. at 252). She had no idea whether the public placed more value on statements from the tobacco industry or statements published in *The New York Times*. (*Id.*).

19. Defendants have argued that this report is not competent evidence for purposes of a Rule 56 motion because it is unverified. However, the Court has permitted the plaintiff to supplement the record in several respects. This supplementation includes Dr. Whelan's affidavit that she wrote the report based upon her own "personal knowledge of the matters, opinions and conclusions expressed" therein. (Docket No. 198). Therefore, the Court finds this to be competent

evidence for purposes of the motion only. In light of note 20, *infra*, which outlines the preparation of the Report as well as Dr. Whelan's credentials as an expert, the Court would reserve judgment as to whether the Report would be admissible at any trial of this case and, for that matter, whether Dr. Whelan would be considered an expert under the prevailing standards. Since the defendants do not now challenge her credentials, this question need not be immediately addressed and the Court expresses no opinion.

20. The Report, Exhibit 18 to plaintiff's memorandum in opposition to the motion, was actually not prepared by Dr. Whelan. Instead it was prepared by one "Mr. Wilner" using Dr. Whelan's previous writing, including the manuscript of her book *The Smoking Gun*, and from her "extensive files on cigarette smoking and health[.]" (Whelan Dep. at 31). Apparently Mr.

ner and M. DeBakey, who specialized in treating lung cancer, concluded that cigarette smoking was causing the disease (as also noted in Professor Hoff's report) (*Id.*); (3) that in 1950, E.L. Wynder and E.A. Graham found that smoking was strongly associated with lung cancer, which was extremely rare in nonsmokers (*Id.* at 2); (4) that in both 1952 and 1953, R. Doll summarized world literature as amounting to *"proof that smoking is a cause of bronchial carcinoma"* (*Id.* at 5, emphasis in Whelan's Report); and (5) that "the evidence was conclusive by 1950, ... overwhelming by 1953, [and] absolutely beyond question by 1954 [that smoking causes cancer]." (*Id.* at 7).

Strangely, Dr. Whelan does not draw from this information the conclusion that the health consequences of smoking were "common knowledge." Rather, relying on an FTC survey conducted in 1981, she concludes that "public knowledge was incomplete." (Whelan Report at 13). Relying on "contemporary" printed news media, she concludes that the media "did not contain sufficient information." (*Id.* at 14).

Plaintiff attempts to diminish the effects of the overwhelming evidence that it was common knowledge even in the 1950s that cigarette smoking was linked to lung cancer by arguing that the tobacco industry, with its own pecuniary interests at heart, continued to contest the scientific findings. This argu-

ment is unavailing in the face of Dr. Whelan's deposition testimony that public opinion polls showed that a "great majority" of the public "believed" smoking was dangerous to their health. It is further unavailing in the face of testimony by Mr. Tompkin that he himself was never aware of any of the alleged debunking activities of the industry (First Dep. at 70–73) and, therefore, he could not have been affected by them. What is factually clear is that at the time he began smoking there was already "common knowledge" about the dangers of smoking.

Plaintiff's argument that the ordinary consumer did not have the knowledge possessed by scientists and physicians is unsupported by the statute, which requires only "ordinary" knowledge. *See also, American Tobacco Company v. The Superior Court of Contra Costa County*, 208 Cal.App.3d 480, 489 n. 5, 255 Cal.Rptr. 280 (1989) (construing a statute similar to Ohio Rev.Code § 2307.75) ("there is no requirement ... that consumers fully appreciate all the risks involved in the use or consumption of the products[.]").

It is clear that a reasonable fact-finder could not fail to conclude that the health risks from smoking, particularly the risk of lung cancer, was "common knowledge" in 1950 when the plaintiff's decedent began to smoke, even if every scientific nuance was not fully understood or appreciated. There is no material factual dispute in this regard.[21]

Wilner was plaintiff's counsel in a different lawsuit which the deponent referred to as "the *Karbiwynk* case." (*Id.* at 21–23). Dr. Whelan gave the Report to Mrs. Tompkin's counsel for use in the instant case. (*Id.* at 24–25). However, she acknowledged at her deposition that, with her permission, "portions that specifically ... related to [the *Karbiwynk* ] case" were removed by plaintiff's counsel. (*Id.* at 26–28). She further acknowledged that she did not "read it again" and that, in fact, she has spent "less than one" hour on the instant case. (*Id.* at 21, 30).

**21.** In her brief in opposition, plaintiff also asserts that the addictive nature of smoking was not known. Dr. Whelan's report does not wholeheartedly support this assertion. (Whelan Report at 9). In any event, Mr. Tompkin does not appear to have been one of those smokers who was "addicted." He testified that he simply made up his mind to quit smoking and then he *did* quit smoking. (First Dep. at 63, 203; Second Dep. at 22–23, 93–94). Mrs. Tompkin corroborated this when she testified that he just

"walked away from it." (Mrs. Tompkin's Dep. at 184–185). In the case that plaintiff relies upon for her addiction argument, the smoker's expert on addiction testified that the addicted person cannot stop smoking without " 'intensive intervention.' " *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex.1997). This was clearly not the case with Mr. Tompkin.

In an attempt to refute the application of Comment *i* to Section 402A of the Restatement (Second) of Torts, an argument not made by the defendants, plaintiff raises the argument that tobacco companies have added substances to the tobacco and have manipulated nicotine content. (Plaintiff's Memorandum at 12–13). This argument is a red herring since there is absolutely no allegation to that effect in the Complaint. The question of "good tobacco" raised by Comment *i* is not an issue in this lawsuit as it has not been alleged that plaintiff's decedent died as a result of smoking cigarettes containing adulterated tobacco with manipulated nicotine levels. This Court sees no need to address this issue or the application or nonapplication of Comment *i*.

■ In addition to plaintiffs design defect and failure to warn claims, the Complaint also alleges claims for misrepresentation which fall within the Act. Ohio Rev.Code § 2307.77 provides:

A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer. A product may be defective because it did not conform to a representation even though its manufacturer did not act fraudulently, recklessly, or negligently in making the representation.

■ To recover under this section of the Act, plaintiff must prove:

1) that the manufacturer made a representation as to a material fact concerning the character or quality of the manufacturer's product;

2) that the product did not conform to that representation;

3) that the plaintiff justifiably relied on that representation; and

4) that the plaintiff's reliance on the representation was the direct and proximate cause of the plaintiff's injuries.

*Gawloski v. Miller Brewing Co.*, 96 Ohio App.3d 160, 165, 644 N.E.2d 731, *appeal dismissed*, 71 Ohio St.3d 1411, 641 N.E.2d 1110 (1994).[22] The Act defines "representation" as "an express representation of a material fact concerning the character, quality, or safety of a product." Ohio Rev.Code § 2307.71(N).

■ Under Ohio law, in order for advertising statements to constitute actionable representations, they must be express representations that use of the product is "safe."

*Gawloski*, 96 Ohio App.3d at 167, 644 N.E.2d 731 (advertisements portraying Miller beer as an "enhancer of the quality of life" did not expressly assert that the product was safe and were, therefore, not actionable). Further, representations constituting "merely the seller's opinion or commendation of the goods" are not actionable under the Act. *Jordan v. Paccar, Inc.*, 37 F.3d 1181, 1185 (6th Cir.1994). Nor is an "attention-getting statement of opinion" actionable. *Dent v. Ford Motor Co.*, 83 Ohio App.3d 283, 286, 614 N.E.2d 1074 (1992), *jurisdictional motion overruled*, 66 Ohio St.3d 1424, 607 N.E.2d 846 (1993).

The Complaint alleges that plaintiff's decedent "relied upon numerous and extensive advertising campaigns by the Defendants which occurred between 1945 and 1965[.]" (Compl.¶ 25).[23] The Court need not determine whether the advertisements allegedly relied upon were misrepresentations regarding product safety because a close review of Mr. Tompkin's depositions fails to reveal any evidence of reliance, justifiable or otherwise. In fact, as the following examples from his depositions illustrate, Mr. Tompkin's memory of the ads was sketchy at best.

Q. ... First of all I would like to ask you, if you could, whether or not you recall any old cigarette advertisements?

A. Partially.

Q. Can you identify for me which ads you do remember having seen? Again, this would be back during the time period that you smoked, pre-1965.

\* \* \* \* \* \*

"Guard against throat scratch" and that Pall Malls are "Outstanding and they are mild," as well as advertisements for Tareyton's "dual filter" charcoal filter tip that suggests that it filters out harmful or irritating elements of the smoke.

Advertisements by Defendants Lorillard, Inc. and Lorillard Tobacco Company regarding Old Gold's "spin filter" and Kent cigarettes' "micronite filter" that suggested that these specialty designed filters removed harmful elements of the smoke and were thus better for the smoker's health. Further, Plaintiff recalls a television advertising campaign with Dennis James promoting Old Gold cigarettes including the slogans, "if you want a treat, instead of a treatment" and "smoother, milder, tastier." (Compl.¶ 25).

---

**22.** Causes of action for misrepresentation and for warranty are identical and are both governed by Section 2307.77. *McAuliffe v. Western States Import Co., Inc.*, 72 Ohio St.3d 534, 651 N.E.2d 957 (1995).

**23.** The Complaint specifically notes, but does not limit its scope to, the following:

Advertisements by Defendant Philip Morris as part of their "Call for Philip Morris" campaign that suggested "an ounce of prevention is worth a pound of cure."

Advertisements by Defendant Liggett Group, Inc., that Chesterfields were "Best for you" featuring Paul Douglas.

Advertisements by Defendant The American Tobacco Company that Pall Mall cigarettes

A. I just remember a few phrases.

Q. What phrases do you remember?

A. Ounce of prevention is worth a pound of cure. Off the top of my head, there was a doctor, a patient, and they were discussing, I don't know what, but they were just in the picture.

Q. What other ads do you remember?

A. On TV there was one with Old Golds where they danced.

\* \* \* \* \* \*

A. And there was a lot of them with the movie stars.

\* \* \* \* \* \*

A. ... Kent cigarettes, there was the micronite filter.

\* \* \* \* \* \*

A. And Herbert Tareyton was the charcoal filter.

Q. What other ads do you remember?

A. There was somebody holding the tobacco leaves. I don't know the rest.

Q. So as of today, those are the ads that you can remember having seen prior to 1965?

A. Yes.

(First Dep. at 176–77). Mr. Tompkin believed he saw the ads in magazines but he could not recall which magazines and he could not be specific about dates. Nor could he say for sure what brand or brands of cigarettes he was smoking at the time he saw any particular ad. (*Id.* at 177–78). He was further questioned about how particular ads affected him and he routinely answered "I don't know." When asked if he switched brands as a result of seeing any particular ad, he also answered "I don't know." When pressed for specifics about ads for each brand of cigarettes he had smoked, he had little or no substantive recollection. (*See generally* First Dep. at 178–185).

When questioned specifically about a collection of cigarette ads (Defendant's Deposition Exhibit 6), he testified as follows:

Q. ... I believe you testified this is material that your attorney sent to you 4 weeks ago or so, is that right?

A. Approximately.

Q. Did you request this material?

A. No, sir.

Q. Do you know how this material was selected?

A. No, sir.

\* \* \* \* \* \*

Q. Do You remember having seen all of these ads, is that your testimony?

A. No, sir.

Q. You have seen or possibly recall seeing some of these ads?

A. That's right.

Q. Do you know how these ads were compiled?

A. No, sir.

(First Dep. at 185–86). Despite this lack of memory at his first deposition regarding any of the ads he alleges he relied on, ten days later, at the deposition taken by his own counsel, his memory for detail was somewhat sharper. For example, he was able to say that he saw particular ads either before he started smoking or during the time he smoked. (*See, e.g.,* Second Dep. at 37, 46, 61–62). Even so, he never testified that he smoked *because* he had relied on the advertisements; in fact, as the examples which follow illustrate, his testimony amounted to no more than reading words from various ads at his attorney's direction to do so.

Q. ... The lead language in that particular exhibit [Plaintiff's Deposition Exhibit 21] says what, the bold language at the top?

A. Here's how science solved your problem of sensitive to nicotine and tars with a great new cigarette, Kent.

Q. Then it goes on in the body to talk about the micronite filter, does it?

\* \* \* \* \* \*

A. It says Kent with the exclusive micronite filter.

Q. And again can you tell us when you saw that particular ad with respect to the time period you were smoking Kents?

\* \* \* \* \* \*

A. Before I smoked Kents.

(Second Dep. at 40–41).

Q. ... With respect to Plaintiff's [Deposition] Exhibit 15, would you tell us what that is, please.

A. It's an ad for Herbert Tareyton cigarettes.

Q. Have you ever seen that ad before?

A. Yes, I have.

Q. And when was that?

A. It was—this was before I smoked Herbert Tareytons.

\* \* \* \* \* \*

Q. Would you show us—would you look at the next exhibit, rather, please. And this is exhibit number [16].

\* \* \* \* \* \*

Q. And have you ever seen that ad before?

A. Yes, sir.

Q. And when was that?

\* \* \* \* \* \*

A. Let's see, this was while I was smoking Herbert Tareytons.

Q. Does it reference a filter?

A. Yes, sir.

\* \* \* \* \* \*

Q. The—what does it say at the top of that ad?

A. Dual filter gives you what no single filter can.

Q. Then underneath there what does it say, underneath the picture?

A. The real thing is mildness; the real thing is fine tobacco taste.

(Second Dep. at 46–47).

Q. I'm going to hand you what has been marked as Plaintiff's Exhibits 2 through 6.... Have you ever seen Exhibit 2 before?

A. Yes.

\* \* \* \* \* \*

Q. Can You tell us when you would have seen it in relationship to your smoking, whether or not you saw it before or after you quit smoking?

\* \* \* \* \* \*

A. This would be before.

\* \* \* \* \* \*

Q. Would you show us that ad, please. This is of what company?

A. Old Gold.

Q. And what is the—what—what do the key words say at the top upper ri—left-hand corner there?

\* \* \* \* \* \*

A. The crowning treat and smoking pleasure now king size.

Q. Those are the largest words on that ad, are they not?

A. Yes, sir.

(Second Dep. at 56–57). The remainder of the discussion about the various ads consists of questions from plaintiff's counsel directing Mr. Tompkin to read from the ads and leading him to say that he remembers seeing the ads before or during the time he smoked. Accepting for now that Mr. Tompkin's recollections are correct, his testimony never suggests that he relied on the words that he was directed by counsel to read. (Second Dep. at 36–62). Nor does his deposition testimony suggest that he switched from one brand to another, or smoked any particular brand, because he thought that brand would be safer for his health. For example:

Q. Why did you choose the Kent brand in 1960?

A. I would say advertising.

Q. What specifically about advertising led you to smoke Kent cigarettes in 1960?

A. The micronite filter.

\* \* \* \* \* \*

Q. Did you believe that smoking a filtered cigarette like Kent would be safer for you health during this time period?

A. I don't know.

Q. What about the filter was it that led you to smoke Kent cigarettes?

A. It was supposed to filter out the cigarette. Whatever the ad was on there, I can't recall exactly the ad.

(First Dep. at 55).

Q. Is it your testimony that you switched to Herbert Tareytons because that cigarette had a filter?

A. I don't know.

Q. Well, what was it about the filter that led you to switch to Herbert Tareyton?

A. I don't remember on that.

Q. Did you believe that the filter would somehow be more beneficial to your health by smoking a cigarette with a filter?

A. I don't know.

(First Dep. at 51–52).

Q. Now I think you told us that your brother Gilbert used to smoke Old Gold cigarettes?

A. Yes, sir.

Q. Okay. And that's the reason you smoked Old Gold cigarettes, isn't that right.

A. Yes.

(Second Dep. at 122). The record contains no more than a scintilla of evidence to support any claim that Mr. Tompkin smoked any particular brand or that he smoked at all because he relied on representations made by the defendants in their advertisements.

For the reasons discussed above, the defendants are entitled to summary judgment on plaintiff's product liability claims in Counts Two through Six. Count Seven is dismissed because it fails to state a claim under Ohio law.

### B. Common Law Fraud (Count Four)

The elements of a claim of common law fraud in Ohio are:

a) a representation or, where there is a duty to disclose, concealment of a fact,

b) which is material to the transaction at hand,

c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

d) with the intent of misleading another into relying upon it,

e) justifiable reliance upon the representation or concealment, and

f) a resulting injury proximately caused by the reliance.

*Burr v. Board of County Com'rs of Stark County,* 23 Ohio St.3d 69, 73, 491 N.E.2d 1101 (1986) (quoting *Cohen v. Lamko, Inc.,*

10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984)). Nondisclosure gives rise to a claim for fraud where there is a duty to disclose, as described below:

a party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.

*Miles v. McSwegin,* 58 Ohio St.2d 97, 100, 388 N.E.2d 1367 (1979); *see also Smith v. Patterson,* 33 Ohio St. 70 (1877) (duty to speak does not depend on existence of a fiduciary relationship between the parties, and may arise in any situation where one party imposes confidence in the other because of that person's position and the party knows of the confidence).

As discussed above in the Section B discussion of plaintiff's product liability claims based on alleged misrepresentations, the record contains no more than a scintilla of evidence to support a claim that Mr. Tompkin smoked because he relied on representations made by the defendants in their advertisements.

Accordingly, defendants are entitled to summary judgment on plaintiff's common law fraud claim in Count Four.

### C. Claim of Conspiracy and Concerted Action (Count Eight)

In Count Eight, plaintiff alleges:

36. . . . [that] Defendants, individually and as members of the tobacco industry, [although in possession of data] that indicated that the use of their cigarettes were [sic] hazardous to the health of consumers since at least 1950 . . . conspired and acted in concert to deprive the public, and particularly the consumers of Defendants' products, of that medical and scientific data, and have misrepresented the adverse health effects of cigarettes to the public.

This Count further alleges that a non-party, The Council for Tobacco Research–USA,

Inc.,[24] in conjunction with another non-party, The Tobacco Institute,[25]

> 39.... through its agents and employees and in conjunction with each of the Defendants, continued to put out information relative to the harmful effects of smoking that was designed to lead the public to underestimate the health consequences of smoking and to lead the public to believe that smoking does not have lethal consequences. The Council in concert with the Defendants has over the years put out misleading and false information knowing that it is misleading and false information.

The Complaint alleges that these actions amount to "misrepresentation, fraud and breach of warranty[.]" (Compl. ¶ 40).

This count of the Complaint is simply another form of fraud/misrepresentation claim, even if it is viewed as a claim of *non* disclosure. To prove this claim, plaintiff must, as with the other fraud claims, establish reliance. *Miles v. McSwegin, supra.*

When questioned at his deposition about these two entities, Mr. Tompkin testified as follows:

Q. Have you ever heard of the Council For Tobacco Research?

A. No, sir.

Q. Do you know what it is?

A. No, sir.

Q. Have you ever heard of the Tobacco Industry Research Committee?

A. No, sir.

Q. Do you know what it is?

A. No, sir.

Q. Have you ever read, heard or seen any statements by the Tobacco Industry Research Committee?

A. Not that I remember.

Q. Have you ever read, seen or heard any statements by the Council For Tobacco Research?

A. I don't recall.

Q. Do you know what the Tobacco Institute is?

A. No, sir.

Q. Have you ever heard of it?

A. I heard of a term Tobacco something-or-other.

Q. You have no recollection of having heard of the Tobacco Institute?

A. No, sir.

Q. Have you ever read, heard or seen any statements of the Tobacco Institute?

A. Not that I remember.

　　*　　*　　*　　*　　*　　*

Q. I take it from your answer of not having heard of these entities that your decision to smoke during the years '50 to '65 were [sic] not influenced in any way by statements from any of these 3 organizations?

　　*　　*　　*　　*　　*　　*

A. I don't know.

Q. So you cannot tell me today that any statements from any of these organizations affected your smoking decisions, is that right?

A. I don't know because I don't know where you are leading me.

Q. I'm not leading you anywhere. I'm just trying to find out if statements from any of these organizations affected your decisions to smoke?

　　*　　*　　*　　*　　*　　*

A. I don't know.

(First Dep. at 70–73).

As was clear in the previous discussion of similar fraud and misrepresentation counts, Mr. Tompkin simply did not testify that he heard statements made by these organizations, believed them, and decided to smoke.

Accordingly, defendants are entitled to summary judgment on Count Eight.

---

24. Plaintiff alleges that "[e]ach of the Defendants are members of the Council for Tobacco Research–USA, Inc., which was organized in 1954 by the tobacco industry including all the Defendants, for the purposes of looking into and researching and doing investigative research as to the allegations of the ill effects of tobacco and cigarette smoking[.]" (Compl. ¶ 38).

25. The Tobacco Institute is an "industry lobbyist" purportedly "organized by the Defendants based on the market share of the tobacco industry[.]" (Compl. ¶¶ 37, 39).

### D. Derivative Claims (Counts Nine, Ten and Eleven)

Plaintiff's claims for damages, wrongful death and loss of consortium, as derivative claims, must fail because all of the underlying substantive claims have failed.

Accordingly, the defendants are entitled to summary judgment on Counts Nine, Ten and Eleven.

### IV. CONCLUSION

For the reasons set forth in detail above, defendants' motions for summary judgment (Docket Nos. 174 and 188) are granted. Docket No. 184, a duplicate of No. 188, is denied for record purposes.

IT IS SO ORDERED.

### JUDGMENT ENTRY ·

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that summary judgment is granted in favor of all defendants. This case is closed, with each party to bear its own costs.