Joann **TOMPKINS, individually; and Stephen G. Tompkins, as Executor for the Estate of Richard F. Tompkins, Plaintiffs,**

v.

**R.J. REYNOLDS TOBACCO COMPANY, Defendant.**

**No. 97–CV–823 FJS GJD.**

United States District Court, N.D. New York.

March 3, 2000.

Wiggins & Masson, LLP, Ithaca, New York (Erin E. McKinley, of counsel), for plaintiffs.

Coughlin & Gerhart, Binghamton, New York (Richard B. Long, of counsel), Jones, Day, Reavis & Pogue, Cleveland, Ohio (Dennis L. Murphy, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, District Judge.

### Introduction

Richard F. Tompkins died in 1996 at the age of 68. For purposes of the motions pending before this Court, the parties agree that he died from lung cancer caused by smoking. He is said to have started smoking around the age of 10. He predominantly smoked unfiltered Camel cigarettes—an average of one pack per day. Since the mid–1950s, his wife encouraged him to quit. In the 1960s, the Surgeon General issued a report on smoking and health, and Congress mandated that warnings be placed on cigarette packaging. In 1984, Mr. Tompkins was diagnosed with high blood pressure and kidney problems, which his doctors said were related to smoking. In 1988, the Surgeon General issued another report concluding that smoking was an addiction. In 1990, Mr. Tompkins' doctor again encouraged him to quit. Mr. Tompkins was diagnosed with lung cancer in 1995, and he died the next year. Although Mr. Tompkins on several occasions tried to quit smoking, each attempt was unsuccessful. He said he would·quit when he believed cigarettes were a real hazard to a person's health.

Mr. Tompkins' wife and son are the Plaintiffs in this action. They have brought suit against Defendant R.J. Reynolds Tobacco Company ("RJR") as the manufacturer of Camel cigarettes. Their complaint alleges fraud and misrepresentation, products liability, negligence, personal injury, breach of warranty, wrongful death and loss of consortium. Federal jurisdiction is based upon diversity of citizenship.

Presently before the Court is (1) RJR's appeal from a decision by Magistrate Judge Gustave J. DiBianco denying RJR's request for a protective order pertaining to particular evidence, (2) Plaintiffs' motion to amend their complaint, (3) Plaintiffs' motion to strike certain of Defendant's affirmative defenses, and (3) RJR's motion for summary judgment.

### Discussion

### I. RJR's Appeal from Magistrate Judge DiBianco's Decision

In the course of discovery, Plaintiffs' expert witness, K. Michael Cummings, Ph. D., prepared a report in which he refers to and quotes from a document entitled "RJR Research and Development Activities Fact Team Memorandum—Volume III" ("R & D Memo"). Defendant objected to the use of this report and sought the imposition of a protective order on the grounds that the R & D Memo is subject to attorney-client and work product privileges. Magistrate Judge DiBianco denied Defendant's motion in an order dated October 21, 1998.

#### A. Standard of Review

The parties disagree as to what standard of review applies on appeal. RJR argues the Court should conduct a *de novo* review, because the question of whether the privileges apply is a mixed question of law and fact. *See* Def.'s Mem. of Law in Supp. of Appeal, at 8.

Yet under Fed.R.Civ.P. 72(a), whenever a magistrate judge determines "nondispositive matters," the district court on appeal may set aside such a determination only if "clearly erroneous or contrary

to law." The Rule reflects the standard of review set forth in 28 U.S.C. § 636(b)(1)(A). Section 636(b)(1)(A) also identifies what is to be considered a "dispositive matter," such that anything not included is classified by default as a "nondispositive matter." Discovery disputes fall into the latter category, and the Eastern District of New York has clearly explained that pre-trial discovery matters "include[ ] issues of privilege." *Commodity Futures Trading Comm'n v. Standard Forex, Inc.*, 882 F.Supp. 40, 42 (E.D.N.Y. 1995) (citations omitted). Moreover, district courts within the Second Circuit consistently have applied the "clearly erroneous or contrary to law" standard of review when privilege determinations are appealed. *See, e.g., Springwell Corp. v. Falcon Drilling Co., Inc.*, No. 96 CIV 7463, 1998 WL 352533, at *1 (S.D.N.Y. July 1, 1998) (Sotomayor, J.); *Bertolotti v. Teamsters Local 814 Pension Fund*, No. 95–CV–5261, 1998 WL 12169, at *2 (E.D.N.Y. Jan. 8, 1998); *New York State Teamsters Council Prepaid Legal Servs. Plan v. Primo & Centra*, 159 F.R.D. 386, 387–88 (N.D.N.Y. 1995). This Court therefore will apply that same standard to the appeal of Magistrate Judge DiBianco's order.

An order is clearly erroneous when "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Primo & Centra*, 159 F.R.D. at 387 (internal quotation marks omitted). An order is contrary to law "when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Thompson v. Keane*, No. 95 Civ. 2442, 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996) (internal quotation marks omitted). Considering that magistrate judges are given broad discretion with respect to pre-trial discovery matters, reversal is warranted only when that discretion is abused. *Abrams v. General Elec. Co.*, No. 95–CV–1734, 1997 WL 458446, at *1 (N.D.N.Y. Aug. 4, 1997).

## B. Applicable Law

■ Because this Court is sitting in diversity, a question arises as to whether the privilege issues raised in this case are governed by federal or state law. With respect to the attorney-client privilege, it is governed by state law. *See* Fed.R.Evid. 501; *Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879, 892 (S.D.N.Y. 1999). In their letter briefs to Magistrate Judge DiBianco, both parties acknowledged that in this context, New York law applies.[1] While this distinction is not drawn in the order on appeal, and although the magistrate judge's opinion relies primarily on federal common law, the order is not contrary to the law of New York. For " 'New York law governing the attorney-client privilege [N.Y.C.P.L.R. § 4503] is generally similar to accepted federal doctrine, albeit with certain variants.' " *Shamis*, 34 F.Supp.2d at 892 (quoting *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993)).

With respect to the work product privilege, federal law controls. *See Bowne*, 150 F.R.D. at 471. Guidance is found primarily in Fed.R.Civ.P. 26(b)(3). *See id.* Since Magistrate Judge DiBianco cited federal law cases addressing a claimed work product privilege, this Court need only ensure that the relevant law was appropriately applied.

## C. Whether the Decision on Appeal is Clearly Erroneous or Contrary to Law

■ The party seeking the protection of a privilege—in this case RJR—must prove the privilege exists and that such privilege has not been waived. *See Shamis*, 34 F.Supp.2d at 892; *Bowne*, 150 F.R.D. at 470–71; *see also Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc.*, 35 F.Supp.2d 582, 590 (N.D.Ohio 1999). In his October 21, 1998 order,

Magistrate Judge DiBianco assumed *arguendo* that the attorney-client and work product privileges apply. Magistrate Judge DiBianco nevertheless denied RJR's request for a protective order, having found that RJR on three separate occasions waived its right to assert privileges over the R & D Memo. This Court will also presume, without deciding, that the asserted privileges apply because in reviewing Magistrate Judge DiBianco's order, his determination that RJR waived its privileges is neither clearly erroneous nor contrary to law.

### 1. History of the R & D Memo

The facts pertaining to the R & D Memo are largely undisputed. Whether the R & D Memo is a privileged document was an issue in a prior lawsuit brought in Minnesota District Court, *State v. Philip Morris.* On March 7, 1998, the Minnesota District Court ordered the production of the R & D Memo, along with thousands of other documents, after adopting a special master's report. RJR and the other defendants attempted to obtain interlocutory review from the higher state courts and the United States Supreme Court, but failed. The documents were eventually produced subject to a protective order barring public release.

Meanwhile, the congressional House Commerce Committee issued subpoenas on February 19, 1998 to the CEOs of the parent corporations of RJR and other cigarette manufacturers who were defendants in the Minnesota *Philip Morris* litigation. The Committee sought to receive copies of the 39,000 documents released in the *Philip Morris* case, including the R & D Memo. The defendants asserted the same privileges being decided upon in state court, and a letter was written to the House Committee Chair, dated March 12, 1998, asking for a delay in deciding the

---

1. RJR recognized that because the communications in the R & D Memo occurred outside New York, the law of a different state might apply. Yet after conducting the grouping of contacts approach adopted in New York, RJR concluded that New York law would still apply because "there appears to be no conflict." Def.'s Oct. 8, 1998 Ltr.Br., at 4 n. 7.

privilege issue until appellate review from the state court decision could be exhausted. The Committee chair did so, and when the appellate stays expired on April 6, 1998, he ruled that the claims of privilege would not be recognized. He also informed the parties that unless the documents were turned over immediately, he would begin contempt proceedings. That same day, the tobacco companies complied with his order.

Although the tobacco companies requested the materials be kept confidential, the Committee released them onto the Internet on April 22, 1998. RJR issued a press release when this occurred, claiming that "[t]aken as a whole—and not selectively out of context—these documents more than demonstrate that our company responsibly researched, manufactures and markets its products to adult smokers." Ex. to Def.'s Mem. of Law, Tab F.

In May 1998, *State v. Philip Morris* settled. Incorporated in the consent judgment was a provision permitting the plaintiffs to seek court approval for public disclosure of those documents that were subject to a protective order, over which the defendants had asserted a privilege but for which no privilege was found to exist. The plaintiffs sought said approval, and the court initially granted it. The defendants opposed the order, and subsequently secured a stay of the release pending resolution of a motion to vacate the order. The stay however, did not apply to documents posted by Congress on the Internet, which included the R & D Memo.

### 2. Whether RJR Waived Its Privileges When It Entered into the Settlement Agreement/Consent Judgment in the Minnesota *Philip Morris* Case

■ Magistrate Judge DiBianco found that RJR waived any privileges when it entered into the consent judgment in *Philip Morris* permitting the plaintiffs to seek public disclosure of those documents for which a privilege was claimed but found not to exist. Magistrate Judge DiBianco

cannot be said to have misapplied the law upon which he relied for his conclusion. *See United States v. International Bhd. of Teamsters,* 961 F.Supp. 665, 673 (S.D.N.Y. 1997), *aff'd* 119 F.3d 210 (2d Cir.1997) (holding that a party waives the attorney-client privilege when it voluntarily consents to the disclosure of any significant part of the communication in issue); *Grumman Aerospace Corp. v. Titanium Metals Corp. of Am.,* 91 F.R.D. 84, 90 (E.D.N.Y.1981) (holding that when a party discloses an item to an adversary, even in the context of settlement, a waiver of the work product privilege is effected).

■ Furthermore, nothing in New York case law holds to the contrary insofar as the waiver of the attorney-client privilege is concerned. In New York, only a client may waive the privilege. *See* N.Y.C.P.L.R. § 4503(a). Such waiver may be achieved by publicly disclosing the matter in issue. *See Jakobleff v. Cerrato, Sweeney & Cohn,* 97 A.D.2d 834, 835, 468 N.Y.S.2d 895 (2d Dep't 1983). Having been a party to the Minnesota *Philip Morris* settlement, RJR thereby can be considered to have waived its privilege over the R & D Memo by consenting to its public disclosure, on the condition that the plaintiffs in that case apply for a court order. Nor has RJR raised the argument that its attorneys consented to the settlement agreement without RJR's permission.

What RJR does contend in its appeal papers is that the consent judgment allowed the plaintiffs to do no more than apply to the Minnesota court for the public release of certain documents, and that nowhere in the consent judgment did RJR waive its right to oppose this application. RJR emphasizes that it did oppose the application and obtained a partial stay. Yet RJR cites no authority either to support its interpretation of the consent judgment or to undermine the conclusion that the failure to include language preserving RJR's right to object is tantamount to effecting a waiver of any applicable privileges. RJR bears the burden of proof,

and its failure to show how Magistrate Judge DiBianco's interpretation of the consent judgment is contrary to law gives this Court no basis upon which to mandate a reversal on appeal.

Moreover, three courts outside this Circuit[2] have reached the same conclusion. They held that RJR waived its privileges over the R & D Memo because the *Philip Morris* consent judgment/settlement agreement contained no provision preserving RJR's right to oppose the plaintiffs' application for the release of documents. *See Iron Workers Local Union No. 17 Ins. Fund*, 35 F.Supp.2d at 591–94; *State v. Philip Morris Inc.*, No. 97–CV–328, slip op. at 8–9 (Wis.Cir.Ct., Branch 11, Dane County Oct. 21, 1998); *State v. Philip Morris*, No. 96122017/CL211487, slip op. at 17–20 (Baltimore City Cir.Ct. Aug. 5; 1998).

### 3. Whether RJR Waived Its Privileges When It Released the R & D Memo to the House Commerce Committee

■ Magistrate Judge DiBianco further found that RJR waived its privileges when it turned over the R & D Memo to the House Commerce Committee in response to the Committee's subpoena. RJR contends that once the Committee Chair rejected the privilege claims, it had no choice but to comply with the congressional subpoena or else risk being held in contempt. Although Magistrate Judge DiBianco acknowledged the limited choices available to RJR once its privilege claims were ruled upon, he nevertheless faulted RJR for failing to exhaust all avenues available for pressing its privilege claims before the Committee Chair. *See Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1427 n. 14 (3d Cir.1991) (noting that a subpoenaed party will waive applicable privileges if it does not continue to challenge the subpoena and withhold requested documents until ordered to do so).

Magistrate Judge DiBianco relied heavily upon the recent decision in *Commonwealth v. Philip Morris*, No. 95–7378–J, 1998 WL 1248003 (Mass.Sup.Ct. July 30, 1998). He agreed with that court's observation that RJR is experienced in dealing with congressional subpoenas. Consequently, the fact that only one letter was written to the Committee Chair did not, in Magistrate Judge DiBianco's mind, satisfy RJR's burden to show that it made a concerted effort to convince the Chair to sustain its privilege assertions—especially when the thrust of this one letter was not to explain the basis for finding that a privilege applied, but rather to ask for a delay in ruling on the issue of privilege until after appellate review was exhausted in Minnesota. Without any evidence to show that RJR pursued all available avenues before the Chair rejected its claims of privilege, Magistrate Judge DiBianco concluded that RJR waived those privileges.

On appeal, RJR offers no evidence that its efforts to persuade the Committee Chair were greater than those recognized by the magistrate judge, such that the factual basis for Magistrate Judge DiBianco's decision cannot be characterized as clearly erroneous. Although RJR considers it "telling" that the magistrate judge failed to identify what other steps RJR could have pursued short of standing in contempt, *see* Def.'s Br., at 14, RJR is mistaken in believing it is the Court's responsibility to do so.[3] RJR carries the burden of proof to establish that a privilege exists. As a result, RJR must show not only what steps it took to challenge the congressional subpoena, but also that those steps represent the fullest extent of

---

**2.** Neither the parties nor this Court could find case law within the Second Circuit addressing this precise issue, although at least seven courts outside the Circuit have dealt expressly with the question of whether RJR has effected a waiver of its asserted privileges over the R & D Memo.

**3.** Nevertheless, this Court refers RJR to *Iron Workers Local Union No. 17 Ins. Fund*, 35 F.Supp.2d at 594–96, for a myriad of options that could have been pursued.

options available. With RJR having failed to do so, Magistrate Judge DiBianco's order is not clearly erroneous.

Nor can the magistrate judge's decision be said to be contrary to law. It both relies upon the legally-recognized principle that a party must take steps to preserve claims of privilege against a subpoena, and parallels so closely the decision by the Massachusetts Superior Court. Furthermore, case law suggests that mere objections to Congress' refusal to extend a privilege are insufficient to contest a congressional subpoena. *See Sanders v. McClellan,* 463 F.2d 894, 899 (D.C.Cir. 1972). Instead, a party may need to risk standing in contempt by refusing to comply with the subpoena, thereby causing the legislators to seek a contempt citation and refer the citation to the Attorney General. *See id.* If prosecution were to result, the party could present in court its argument in favor of finding a privilege. *See id.* Applying these principles to this case, RJR's efforts clearly fell short. The tobacco company failed even to register an objection with the Commerce Committee after the Chair denied its privilege requests. Instead, RJR turned over the requested documents on the same day the Chair's decision was issued.

As a final consideration, other courts have determined that RJR failed to take reasonable steps to resist compliance with or mount a challenge to the congressional subpoena, thereby waiving any applicable privileges. *See Iron Workers Local Union No. 17 Ins. Fund,* 35 F.Supp.2d at 594–96; *State v. R.J. Reynolds Tobacco Co.,* No. CJ–96–1499, Tr. of Proceedings at 67–69 (Okla.Dist.Ct. Oct. 20, 1998).

### 4. Whether RJR Waived Its Privileges When It Issued Its April 22, 1998 Press Release

Last of all, Magistrate Judge DiBianco found that RJR waived its privileges by issuing its April 22, 1998 press release at the time Congress released the R & D memo, along with numerous other documents, onto the Internet. In light of Plaintiffs' claims against RJR for fraud and misrepresentation, products liability, negligence and breach of warranty, and the fact that statements in the press release indicate that the documents released onto the Internet—including the R & D Memo—illustrate how RJR has responsibly researched, manufactured and marketed its product, Magistrate Judge DiBianco reasoned that RJR has put the R & D Memo "at issue." As such, he held that the company could not now claim a privilege after having used the occasion of the R & D Memo's release to tout its own virtues.

Although courts within this Circuit have applied a fairness test to determine whether a party has implicitly waived a privilege, thereby causing the communication at issue to be disclosed, that test was applied to claims asserted within the context of litigation. *See, e.g., United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991); *Worthington v. Endee,* 177 F.R.D. 113, 116–17 (N.D.N.Y.1998); *Tribune Co. v. Purcigliotti,* No. 93 Civ. 7222, 1997 WL 10924, at *5, 7 (S.D.N.Y. Jan. 10, 1997), *modified in part by* 1998 WL 175933 (S.D.N.Y. Apr.14, 1998). Among the common characteristics of an implied waiver is that a litigant places the protected communication "at issue" through an affirmative act, such as claiming an affirmative defense. *See Worthington,* 177 F.R.D. at 116. RJR's press release however, is an extrajudicial statement that may be subject to "no waiver or only a narrow one." *Tribune Co.,* 1997 WL 10924, at *5. The Second Circuit has held that extrajudicial disclosure of attorney-client communication does not constitute waiver where the client does not subsequently use that communication in a judicial proceeding. *See In re von Bulow,* 828 F.2d 94, 102 (2d Cir.1987).

While the magistrate judge's order appears to be contrary to law in that it applied the fairness doctrine solely to RJR's press release without first considering whether RJR's affirmative defenses ultimately placed the R & D Memo at

issue, no need exists to explore the parameters of this question. Nor is it necessary to analyze whether the press release constitutes a voluntary disclosure on the part of RJR, such that a waiver of the privileges could stand on this basis. *See State v. R.J. Reynolds Tobacco Co.*, No. CJ–96–1499, Tr. of Proceedings at 70 ("I believe that this [April 22, 1998] press release demonstrates and is further evidence … in support of voluntary disclosure."). Magistrate Judge DiBianco's order that RJR effected a waiver of privileges has already been affirmed on two independent grounds.

### 5. Existence of Contrary Conclusions in Case Law

This Court acknowledges that a split exists among courts that have addressed the precise question of whether RJR waived any privileges applicable to the R & D Memo. *See Iron Workers Local Union No. 17 Ins. Fund*, 35 F.Supp.2d 582 (waiver by entering into consent judgment and complying with congressional subpoena); *State v. Philip Morris Inc.*, slip op. (no waiver by complying with congressional subpoena or issuing press release, but waiver by entering into consent judgment); *State v. R.J. Reynolds Tobacco Co.*, Tr. of Proceedings (waiver by complying with congressional subpoena); *State v. Philip Morris*, slip op. (no waiver by complying with congressional subpoena, but waiver by entering into consent judgment and issuing press release); *Commonwealth v. Philip Morris Inc.*, slip op. (waiver by complying with congressional subpoena); *Reed v. Philip Morris Inc.*, Civ. No. 5070–96, Tr. of Proceedings (D.C.Super.Ct. June 25, 1998) (no waiver by entering into consent judgment); *State v. American Tobacco Co.*, No. 96–2–15056–8, slip op. (Wash.Super.Ct. May 1, 1998) (no waiver by complying with congressional subpoena).

Yet while authority may exist to support RJR's position, the more critical inquiry on appeal is whether authority exists to support Magistrate Judge DiBianco's decision. As the foregoing analysis illustrates, this Court cannot conclude that the magistrate judge "fail[ed] to apply or misapplie[d] relevant statutes, case law or rules of procedure." *Thompson*, 1996 WL 229887, at *1. Consequently, his order is not contrary to law. Moreover, remembering that magistrate judges are afforded much discretion in making pre-trial discovery determinations, this Court can find no basis for believing that Magistrate Judge DiBianco abused his discretion such as to warrant a reversal. Accordingly, Magistrate Judge DiBianco's October 21, 1998 Order is affirmed, and RJR's motion for a protective order is denied.

### II. Plaintiffs' Motion to Amend the Complaint

On October 27, 1998—after this lawsuit was initiated—the New York Supreme Court, Appellate Division, issued a decision explaining that allegations of fraud must include examples of misrepresentation upon which a cigarette user relied. *See Small v. Lorillard Tobacco Co., Inc.*, 252 A.D.2d 1, 15, 679 N.Y.S.2d 593 (1st Dep't 1998), *aff'd* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999). Plaintiffs wish to amend their complaint to reference particular advertisements and pronouncements issued by RJR, upon which they claim Mr. Tompkins reasonably relied.

Fed.R.Civ.P. 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." Yet leave may be denied where permitting the amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir.1997).

If the proposed amended pleadings cannot survive RJR's motion for summary judgment on the merits, it serves little purpose to allow the amendments to be made. The Court's analysis (*infra*) of the sufficiency of the evidence pertaining to Plaintiff's fraud claim concludes that even with evidence of specific advertisements, Plaintiffs cannot survive summary judg-

ment. As such, Plaintiffs' motion to amend is denied.[4]

### III. Plaintiffs' Motion to Strike Certain Affirmative Defenses

■ Plaintiffs move pursuant to Fed. R.Civ.P. 12(f) to strike a myriad of affirmative defenses asserted by RJR in its answer. This Court has stated that "[c]ourts generally disfavor Rule 12(f) motions and do not routinely grant them." *State of New York v. Almy Bros., Inc.*, 971 F.Supp. 69, 72 (N.D.N.Y.1997) (McCurn, J.). Where a plaintiff moves to strike affirmative defenses, the defendant's pleadings are to be construed liberally so as to give the defendant a full opportunity to support its claims after discovery has been made. *See id.* A motion to strike should be granted only where (1) it appears to a certainty that the plaintiff will succeed regardless of what facts could be proved in support of the defense; (2) the affirmative defense sought to be struck does not present disputed and substantial questions of law that could be resolved in such a way as to support the defense; and (3) the plaintiff shows it will be prejudiced by inclusion of the affirmative defense. *See id.*

RJR contends that Plaintiffs' motion should be dismissed as untimely, since Fed.R.Civ.P. 12(f) provides that a motion to strike should be brought "within 20 days after the service of the pleading upon the party." A motion to strike was dismissed for this reason in *Harley–Davidson, Inc. v. Estate of O'Connell*, 13 F.Supp.2d 271, 278 (N.D.N.Y.1998).

On the other hand, courts within the Second Circuit have ruled on the merits of a motion to strike brought after the expiration of the 20-day window, based upon the language in Rule 12(f) giving judges

discretion to strike material from a pleading on their own initiative. *See, e.g., Wine Markets Int'l, Inc. v. Bass,* 177 F.R.D. 128, 132–33 (E.D.N.Y.1998) ("In effect, the Court's discretion renders the [20] day rule essentially unimportant.") (internal quotation marks omitted).

Looking to the merits of the motion before this Court, Plaintiffs have provided no reason as to why they would be prejudiced if the affirmative defenses were not stricken. Nor can the Court think of a reason after making the following observations: Plaintiffs have already spent their resources on discovery; this Court does not submit pleadings to the jury; Plaintiffs were not precluded from challenging the defenses on summary judgment; and should RJR try to raise a meritless defense at trial, Plaintiffs may ask the Court to prevent the jury from considering it.

In sum, regardless whether Plaintiffs' motion is considered timely, it is dismissed.

### IX. RJR's Motion for Summary Judgment

RJR will be granted summary judgment if no genuine issue of material fact exists and RJR is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). All ambiguities and reasonable inferences must be viewed in the light most favorable to Plaintiffs. *See Reeves v. Johnson Controls World Servs.,* 140 F.3d 144, 149 (2d Cir.1998). Should RJR meet its burden, Plaintiffs must come forward with specific facts showing a genuine issue exists for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

---

4. The Court is relying upon the evidence already in the record because when questioned at oral argument about the prejudice to RJR if the complaint were to be amended, Plaintiffs' counsel represented that RJR asked witnesses at depositions about specific ads issued by the company in the past. Plaintiffs therefore believed the deposition testimony would not

change if the elements of the fraud claim were pleaded with greater particularity. From this statement, combined with the fact that Plaintiffs have not indicated more discovery is necessary, the Court presumes that even if Plaintiffs were allowed to amend their complaint, they would proceed to trial with the evidence presently available.

**A. Intentional Misrepresentation and Fraud**

**1. Whether Plaintiffs' claims for intentional misrepresentation and fraud is preempted by the Federal Cigarette Labeling and Advertising Act, as amended by the Public Health Cigarette Smoking Act of 1969**

RJR maintains that Plaintiffs' claims for intentional misrepresentation and fraud is preempted with respect to events that occurred after the effective date of the Federal Cigarette Labeling and Advertising Act, as amended by the Public Health Cigarette Smoking Act of 1969. This statute provides that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." 15 U.S.C. § 1334(b). The Supreme Court has held that this federal law preempts both state common law and statutory causes of action. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 521–23, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

With respect to fraudulent misrepresentation claims, the Supreme Court distinguished among claims that a tobacco company should have made further disclosures in its advertising and promotional statements, claims that a tobacco company should have made further disclosures through channels other than advertising or promotion, and claims that a tobacco company should have included truthful material in its advertising and promotional statements. The first category of claims is preempted, because it is little more than a requirement that additional warnings be included in advertising and promotional materials. *See id.* at 527, 112 S.Ct. 2608. The same would be true of claims that faulted a tobacco company for issuing ads that neutralize the effect of federally-mandated warnings. *See id.* The second and third categories of claims however, are not preempted. The Court reasoned that a

state-law duty to disclose certain facts by means other than advertising and promotion would not conflict with the federal statute. *See id.* at 528, 112 S.Ct. 2608. Likewise, an allegation that a tobacco company has included false statements in its advertising and promotional materials is based not on a duty related to smoking and health, "but rather on a more general obligation: the duty not to deceive." *Id.* at 528–29, 112 S.Ct. 2608.

Plaintiffs' complaint incorporates two kinds of fraud claims. The first is that RJR actively concealed research results demonstrating the health risks associated with smoking. Yet Plaintiffs fail to identify in either their complaint, proposed amended complaint, or opposition papers to summary judgment what state-law duty existed that would have required RJR to reveal such information through means other than advertising. Such identification is necessary to save the claim from preemption. *See id.* at 528, 112 S.Ct. 2608 ("Petitioner's claims that respondents concealed material facts are therefore not preempted *insofar as those claims rely on a state-law duty* to disclose such facts through channels of communication other than advertising or promotion.") (emphasis added). Otherwise, the complaint reads as if RJR should have made its disclosures through ads or promotional statements. As previously noted, the *Cipollone* Court held such a cause of action to be preempted by federal law. *See id.* at 527, 112 S.Ct. 2608. Consequently, to the extent Plaintiffs' complaint faults RJR for concealing information, it is preempted with respect to RJR's actions taken after the enactment of the 1969 amendments.

Preemption however, does not apply to Plaintiffs' claim alleging that RJR made false statements and misled Mr. Tompkins' through its advertising and promotions. The Supreme Court made clear that the Federal Cigarette Labeling and Advertising Act "does not encompass the more general duty not to make fraudulent statements." *Id.* at 529, 112 S.Ct. 2608. Other

courts have followed suit. *See, e.g., Magnus v. Fortune Brands,* 41 F.Supp.2d 217, 223 (E.D.N.Y.1999) ("Since plaintiffs' [fraud and deceit] claim relies on allegations that defendants actively disseminated deceptive information, it is predicated on a duty not to deceive ..., and it, too, survives under *Cipollone.*").

### 2. Whether Plaintiffs have failed to show reasonable reliance

 To prove intentional misrepresentation and fraud, Plaintiffs must show: (1) representation of material fact; (2) falsity; (3) scienter; (4) reasonable reliance; and (5) damages. *See Small,* 679 N.Y.S.2d at 604. Even with the proposed particularized amended pleadings offered by Plaintiffs, which identify specific ads and promotional materials upon which Mr. Tompkins is said to have relied, RJR claims there is an absence of evidence to establish the fourth element of reasonable reliance. It cites deposition testimony to show that Mr. Tompkins never discussed RJR advertising or promotions with his wife, children, sisters or co-workers. *See* Dep. of Joann Tompkins (wife), at 194–95, 197–98; Dep. of Stephen Tompkins (son), at 64; Dep. of Shirley Phelps (daughter), at 25, 58; Dep. of Linda Mattson (daughter), at 52–53; Dep. of Richard Tompkins (son), at 44–46; Dep. of Mary Jane Lundy (sister), at 57, 70; Dep. of Lenora Tompkins (sister), at 19, 30–31; Dep. of William Harrower (co-worker), at 12; Dep. of Kenneth Sutfin (co-worker), at 37. RJR argues that Plaintiffs have no other evidence to suggest Mr. Tompkins either saw or relied upon the advertisements identified by Plaintiffs.

With RJR having met its burden to show the absence of a genuine issue of material fact, Plaintiffs must point to specific evidence creating a genuine issue for a factfinder to decide. *See Urena v. Biro Mfg. Co.,* 114 F.3d 359, 362 (2d Cir.1997). Plaintiffs resort to the following circumstantial evidence. First, they claim Mr. Tompkins would repeat statements that Camel cigarettes had a better taste of flavor and were a "real" cigarette. Yet even assuming such representations to be true, Plaintiffs never identify any RJR advertisement or promotion incorporating these sayings. Second, Plaintiffs highlight that Mr. Tompkins read *Look* Magazine and the *Ithaca Journal,* in which RJR advertised Camel cigarettes. Again however, Plaintiffs fail to provide any link between Mr. Tompkins having read those publications and his having read and relied upon the RJR ads contained within. In fact, Plaintiffs' brief states only that Mr. Tompkins "had occasion to see" and "had access" to RJR advertising.

The Appellate Division, First Department has made clear that "individualized proof of reliance is essential to [a] cause[ ] of action ... for common-law fraud." *Small,* 252 A.D.2d at 8, 679 N.Y.S.2d 593. In *Small,* the smoker plaintiffs' fraud claim against cigarette manufacturers was dismissed because the complaint contained no facts to suggest that reliance had occurred. Simply having "read news periodicals during the time period the alleged misrepresentations were made ... falls far short of proving [the plaintiff] actually relied upon them." *Id.* at 16, 679 N.Y.S.2d 593 (quoting *Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 171 (5th Cir.1996)).[5] The Fifth Circuit in *Allgood* granted summary judgment to the defendants on the plaintiffs' fraud claim because the evidence showed only that the deceased smoker had read publications containing cigarette ads,

---

**5.** The First Department explained that it was requiring individualized proof of reliance because the defendants did not control all of the information reaching consumers about cigarettes. *See* 679 N.Y.S.2d at 600 ("[W]idely-available information about nicotine forecloses any presumption of reliance and requires individualized inquiry into whether particular class members were unaware of

such information."). As the analysis under the duty to warn claim (*infra* ) will indicate, RJR's largely-unrefuted evidence shows the dangers of smoking were common knowledge when Mr. Tompkins began using Camel cigarettes in 1938. As such, it is appropriate to require individualized evidence on Plaintiffs' cause of action for intentional misrepresentation and fraud.

as opposed to having either read or relied upon the ads. *See* 80 F.3d at 171. Plaintiffs' evidence in the case at hand shows little more. In addition, RJR emphasizes that some of the ads submitted by Plaintiffs were published when Mr. Tompkins was in the Army or in prison, and no proof has been offered to show that Mr. Tompkins read the *Ithaca Journal* or *Look Magazine* at those times.

The *Allgood* court further noted that the plaintiffs' expert witness testified that only an immediate and personal life-threatening situation would have caused the smoker to stop smoking, and the smoker's wife testified at her deposition that no amount of warning could induce her husband to quit. *See id.* at 171–72. Likewise, Mr. Tompkins' wife testified that cigarette advertising did not influence her husband's decision to smoke. *See* Dep. of Joann Tompkins, at 195–97. Mrs. Tompkins also testified that she thought her husband would be encouraged to quit "when he felt [cigarettes] were really, really a hazard to a person's health," and that he did not personalize the risks of smoking. *Id.* at 106–07.

At oral argument, Plaintiffs' counsel suggested that *Allgood* did not provide the proper standard by which to determine whether adequate proof of reliance had been presented. Counsel encouraged the Court to look instead to *City of New York v. Lead Indus. Ass'n, Inc.*, 241 A.D.2d 387, 660 N.Y.S.2d 422 (1st Dep't 1997). In that case, the Appellate Division, First Department affirmed the lower court's ruling that "a showing of direct reliance is not necessary where it is claimed that the defendant marketed a product it actually knew to be unsafe without warning of the dangers it knew to be inherent in the product." 241 A.D.2d at 387, 660 N.Y.S.2d 422.

Nevertheless, this standard is not controlling in the case presently before the Court. *Lead Industries* involved lead paint and abatement costs, whereas Plaintiffs' case involves cigarette smoking.

This distinction is important, because the First Department issued the opinions in both *Lead Industries* and *Small*. Had the appellate court intended to apply the same standard in both kinds of cases, it could have done so. Equally important is the fact that *Small* was decided after *Lead Industries* This sequence of events means that *Lead Industries* was available as precedent to the First Department when it decided *Small*, but the court instead chose to employ an individualized standard of direct reliance in fraud cases against tobacco companies for their smoking advertisements. For these reasons, *Small* governs this Court's analysis.

With Plaintiffs having failed to establish that Mr. Tompkins relied on any RJR advertising or promotional statements in deciding whether to smoke, summary judgment must be granted to RJR on the intentional misrepresentation and fraud claims.[6]

## B. Strict Liability—Design Defect: Whether Camel cigarettes were "not reasonably safe"

RJR moves for summary judgment on the basis that Plaintiffs cannot produce sufficient evidence to meet their burden of proving that Camel cigarettes are not reasonably safe. Under New York law, RJR will be strictly liable for a design defect if:

"(1) the product is 'defective' because it is not reasonably safe as marketed; (2) the product was used for a normal purpose; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff by the exercise of reasonable care would not have both discovered the defect and apprehended its danger; (5) the plaintiff would not have otherwise avoided the injury by the exercise of ordinary care."

*Urena*, 114 F.3d at 363. To establish a prima facie case, Plaintiffs must show that "the manufacturer breached its duty to market safe products when it marketed a

---

6. Having dismissed the fraud cause of action on the merits, no need exists to analyze RJR'S argument that the claim was brought after the applicable statute of limitations had expired.

product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983).

In New York, the following standard is applied in deciding whether a product is not reasonably safe: "whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (quoted in *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995)). The burden of proof rests with Plaintiffs. *See Urena*, 114 F.3d at 364. Plaintiffs are "under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and *it was feasible to design the product in a safer manner.*" *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (emphasis added). RJR may produce evidence showing that utility outweighed risk. *See id.* Should Plaintiffs fail to make out a prima facie case of design defect, the claim need not be submitted to a jury. *See Scarangella v. Thomas Built Buses, Inc.*, 93 N.Y.2d 655, 659, 695 N.Y.S.2d 520, 717 N.E.2d 679 (N.Y.1999).

Various factors are considered in the utility/risk balancing test, such as: (1) the utility of the product to the public as a whole; (2) the utility of the product to the individual user; (3) the likelihood that the product will cause injury; (4) the availability of a safer design; (5) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (6) the degree of awareness of the product's potential danger that can be reasonably attributed to the plaintiff; and (7) the manufacturer's ability to spread the cost of any safety-related design changes. *See Denny*, 87 N.Y.2d at 257, 639 N.Y.S.2d 250, 662 N.E.2d 730; *Voss*, 59 N.Y.2d at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204.

Plaintiffs in the instant case argue that RJR's Camel cigarettes contain a "dangerous nicotine delivery system." Pls.' Mem. in Opp'n to Mot. for Summ.J., at 17. They further claim they can prove RJR adds ammonia and carcinogenic chemicals to cigarette tobacco, thereby making their cigarettes a more dangerous product for consumers. *See id.*[7] With respect to the feasibility of a safer design, Plaintiffs rely upon the expert witness report prepared by Dr. Cummings.[8] *See* App. to Pls.' Mem. in Opp'n to Summ.J.,

7. The Court is concerned that Plaintiffs point to no evidence in the record to support their contention. At the summary judgment stage, a plaintiff generally is expected to direct attention to whatever proof he has to support his claim in front of a jury.

8. RJR objects to the Court's consideration of this expert report on the basis that Dr. Cummings is not qualified to testify as an expert under the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* identified four factors a court may consider when deciding whether expert testimony is admissible: (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether, with respect to a particular technique, a high known or potential rate of error exists, and whether standards exist to control the technique's operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *See id.* at 592–94, 113 S.Ct. 2786 (summarized in *Kumho Tire*, 526 U.S. 137, 149–50, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). These factors however, are not to limit a court's inquiry. *See Kumho Tire*, 526 U.S. at 151, 119 S.Ct. 1167. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152, 119 S.Ct. 1167.

RJR cites to Dr. Cummings' deposition transcript, in which he acknowledges he is neither a chemist, toxicologist nor biologist. *See* Mem. in Supp. of Def.'s Mot. for Summ. J., at 14 n. 9. RJR further notes that Dr. Cummings' opinions on cigarette design have never been tested, published, or subjected to peer review. *See id.* at 15. Plaintiffs never address these criticisms. Perusing Dr. Cum-

Tab 2, Ex. B. Dr. Cummings describes several alternative cigarette designs that were available to RJR, including the Premier and Eclipse cigarette designs tested by RJR in the 1980s and 1990s. *See id.* at ¶¶ 4.1–4.7, 6.12.

RJR counters Plaintiffs' expert with a statement prepared by James Kirby Martin, Ph.D. *See* App. to Def.'s Mem., Ex. B, Item 3. Dr. Martin cites to evidence indicating that the general public has been informed about the health risks of smoking since the turn of the century. Moreover, RJR notes that Plaintiffs' expert, Dr. Cummings, acknowledges in his report that smokers generally recognize the health risks of smoking. *See* App. to Pls.' Mem., Tab 2, Ex. B, at ¶ 6.14. One of Plaintiffs' witnesses, David J. Davin, M.D., also testified that the public has been aware of the health risks of smoking for decades. *See* Dep. of David J. Davin, M.D., at 170–71. Finally, Plaintiffs admit in their response to RJR's Statement of Undisputed Facts that "the public has been advised about certain risks of smoking for decades." Pls.' Resp. to Def.'s Rule 7.1(f) Statement of Undisputed Facts, at ¶ 35; *see also id.* at ¶ 42.

In addition, Plaintiffs admit that Mrs. Tompkins informed her husband of the danger of smoking throughout their marriage, referred to cigarettes as "coffin nails" in the 1960s, referred to cigarettes as "cancer sticks" in the 1970s, and discussed the 1964 Surgeon General's report on smoking and health with her husband. *See id.* at ¶¶ 20, 23, 25. Furthermore, two doctors told Mr. Tompkins to quit because of health problems due in part to smoking. *See id.* at ¶¶ 33, 34.

With respect to safer designs, Plaintiffs provide only that "[a] safer, feasible alternative cigarette design was available to [RJR] since at least the 1950s." *Id.* at ¶ 12. Dr. Cummings' report focuses on research available from the 1950s. *See* App. to Pls.' Mem., Tab 2, Ex. B, at ¶¶ 4.1, 4.3–4.3. Yet Plaintiffs seek to recover for injuries to Mr. Tompkins as far back as the late 1930s. Nor do Plaintiffs ever discuss the cost of manufacturing or marketing an alternative design, or whether an alternative product would be profitable for any company.

Plaintiffs' admission of public awareness about the risks of smoking, along with the warnings made directly to Mr. Tompkins, undermines any conclusion that Mr. Tompkins was not reasonably aware of the dangers of cigarettes. Equally important, Plaintiffs have failed to meet their burden pertaining to evidence of a *feasible,* alternative design. For these reasons, summary judgment is granted to RJR on the strict liability design defect claim.[9]

---

mings' report, his credentials focus predominantly upon his education and work experience, without much attention to what steps he took to evaluate alternative cigarette designs.

The Court at this time will not rule upon the admissibility of Dr. Cummings' report as an expert report, because even when taken into consideration, it fails to provide Plaintiffs with the evidence needed to survive summary judgment.

9. The Court notes however, that two arguments raised by RJR in support of summary judgment have no merit. First, RJR cites to comment i of § 402A of the Restatement (Second) of Torts, which provides that "[g]ood tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous." RJR relies upon this language to show that cigarettes are not unreasonably dangerous when manufactured according to plan. Yet this Court has ruled that "to the extent that Comment i suggests that cigarettes cannot be defective, it does not represent New York law." *Semowich v. R.J. Reynolds Tobacco Co.,* No. 86–CV–118, 1988 WL 86313, at *4 (N.D.N.Y. Aug. 17, 1988). The plaintiff in *Semowich* was given an opportunity to prove at trial that cigarettes are defective. *See id.* In light of this precedent, comment i is unavailing.

Second, RJR contends that Plaintiffs must prove Mr. Tompkins would have switched to a safer cigarette had one been available. The Court can find no support for this proposition in New York case law. Nor do the cases to which RJR cites reflect what RJR represents. The pages referred to in *Urena* discuss whether the product in issue (a commercial band saw for cutting meat) was unreasonably dangerous. *See* 114 F.3d at 364–65. While the

## C. Strict Liability—Failure to Warn[10]

### 1. Whether Plaintiffs' claim for failure to warn is preempted by the Federal Cigarette Labeling and Advertising Act

The Supreme Court, in determining the extent of the preemptive effect of the Federal Cigarette Labeling and Advertising Act, held that a failure to warn claim is preempted insofar as it requires a showing that a manufacturer's advertisements or promotions should have included additional or clearer warnings. *See Cipollone,* 505 U.S. at 524, 112 S.Ct. 2608. Yet such a claim would not be preempted to the extent that it related to a manufacturer's actions that have no connection to advertising or promotion. *See id.* at 524–25, 112 S.Ct. 2608.

Plaintiffs' complaint does not delineate the basis for its failure to warn claim, which makes it difficult to determine whether preemption applies. Yet Plaintiffs in their brief state that their duty to warn claim prior to 1969 is not preempted. *See* Pls.' Mem. in Opp'n to Mot. for Summ. J., at 25. This assertion implicitly acknowledges that the federal statute preempts their claim after 1969, such that the Court finds preemption applies.

### 2. Whether Plaintiffs can show that RJR had a duty to warn prior to 1969

RJR believes it had no duty to warn because the risks of smoking were "open and obvious" and known through common knowledge or learning. Furthermore,

Second Circuit notes in its analysis that the plaintiff would have asked to use a safety device if he had known one was available, the Circuit Court does not indicate that this element was required as part of the plaintiff's burden of proof. Rather, the evidence was cited to in the context of a larger discussion as to whether the defendant had provided adequate instructions and warnings—not whether a safer design was possible. Likewise, *Deere v. Goodyear Tire & Rubber Co.,* 175 F.R.D. 157, 162 (N.D.N.Y.1997) (Hurd, J.), provides no support for RJR's contention. The page cited to in that case discusses the lack of any evidence of a feasible alternative

RJR highlights evidence that Mr. Tompkins was aware of smoking risks since the 1950s when his wife began urging him to quit.

A manufacturer has a duty to warn "the appropriate audience of all potential dangers of which it, through the exercise of reasonable care, knows or should know." *Ellis v. Cardiac Pacemakers, Inc.,* No. 96–CV–0535E(F), 1998 WL 401682, at *5 (W.D.N.Y. Jul.17, 1998). Yet there is no duty to warn consumers of "obvious risks and dangers," which is defined to mean "those risks and dangers which could have been or should have been appreciated by the user or that can be recognized as a matter of common sense." *Pigliavento v. Tyler Equip. Corp.,* 248 A.D.2d 840, 842, 669 N.Y.S.2d 747 (3d Dep't 1998); *see also Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 241, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998) (holding that no duty to warn exists when hazards are known through "general knowledge"); *Butler v. Interlake Corp.,* 244 A.D.2d 913, 914, 665 N.Y.S.2d 192 (4th Dep't 1997) (same, although using phrase "common knowledge").

The Court could find no New York case law explicitly addressing whether "common knowledge" involves a subjective or objective standard. The New York Court of Appeals in *Liriano* makes reference to the actual knowledge of an injured party, but never expressly rules out the possibility that the general knowledge of a community may suffice to show no duty to warn.

design, and never discusses whether the plaintiff actually would have used that design. The only case RJR cites that is directly on point is from the District Court of New Jersey, applying New Jersey law. That case has never been cited by courts within New York state or the Second Circuit for the particular proposition RJR is trying to advance. Accordingly, the Court will not consider whether Plaintiffs in this case have met such a requirement.

10. Although the Court does not see the basis for a failure to warn claim in Plaintiffs' complaint, it will analyze the merits of such a claim since RJR acknowledges that it exists.

*See* 92 N.Y.2d at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303. The use of the phrase "should have known" in *Pigliavento* suggests a plaintiff's actual knowledge is not necessarily determinative. Likewise, the New York Court of Appeals in *Smith v. Stark,* 67 N.Y.2d 693, 694, 499 N.Y.S.2d 922, 490 N.E.2d 841 (1986), found no duty to warn where the plaintiff "must have known" of the danger presented due to his general knowledge, observations and "plain common sense." *Smith* is cited in *Liriano.* *See* 92 N.Y.2d at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303. Moreover, the Southern District of New York has observed that "the inquiry into the obviousness of the danger does not turn on the actual knowledge of the user." *Kerr v. Koemm,* 557 F.Supp. 283, 287 (S.D.N.Y. 1983) (Leval, J.) (distinguishing exception for "obvious danger" from exception for "knowledgeable user" and explaining that the latter requires proof of subjective knowledge). Consequently, the Court will consider evidence of what was known generally by the public throughout the time Mr. Tompkins smoked cigarettes, without limiting its analysis to what Mr. Tompkins personally may or may not have known.[11]

Two district courts, in applying state law akin to that of New York, have refused to take judicial notice that the hazards of smoking have been common knowledge for decades preceding the 1969 amendments to the Cigarette Labeling and Advertising Act. *See Hill v. R.J. Reynolds Tobacco Co.,* 44 F.Supp.2d 837, 844 (W.D.Ky.1999); *Burton v. R.J. Reynolds Tobacco Co.,* 884 F.Supp. 1515, 1525–26 (D.Kan.1995). The district court in *Hill* observed:

> [T]he judicial notice inquiry [in this case] would focus on the state of popular consciousness concerning cigarettes before 1969. The Court is simply unwilling to take judicial notice of something

as intangible as public knowledge over three decades in the past. The exercise seems inherently speculative and an inappropriate topic for judicial notice.

44 F.Supp.2d at 844. Likewise, in *Burton,* the district court refused to find as a matter of law that the dangers of smoking have been common knowledge since the 1950s. *See* 884 F.Supp. at 1526. The court, quoting a state court decision, noted that:

> "[t]here is no basis for our judicially noticing what the ordinary consumer's knowledge concerning the addictive qualities of cigarettes may have been when [plaintiff] began smoking in 1940. The state of knowledge attributable to the community of individuals consuming cigarettes has changed over time and will continue to do so. It was not until 1988 that the Surgeon General published a report informing of the addictive nature of cigarettes."

*Id.* (quoting *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1054 (Ind.App. 1990)) (alterations in original).

■ This Court also will refrain from taking judicial notice that the risks of cigarette smoking have been "open and obvious" to consumers since Mr. Tompkins began smoking in 1938. As stated in *Hill,* the issue involves questions of fact. *See* 44 F.Supp.2d at 844 n. 7. The District Court for the Northern District of Ohio has looked at the issue in this way, where the plaintiff smoker began using cigarettes in 1950. *See Tompkin v. American Brands, Inc.,* 10 F.Supp.2d 895, 901–05 (N.D.Ohio 1998).[12]

■ As in *Tompkin,* this Court will compare RJR's evidence of "common knowledge" with that submitted by Plaintiffs to determine whether any genuine

---

11. As such, the Court gives little weight to the deposition testimony of Joann Tompkins that her husband would have quit smoking if he had really known that cigarettes would be harmful to one's health.

12. *Cf. Jones v. American Tobacco Co.,* 17 F.Supp.2d 706, 718 (N.D.Ohio 1998) (deciding as a matter of law that the risks of smoking were common knowledge, where the plaintiffs had begun smoking either close to or after Congress first required health warnings on cigarette labels in 1966).

issue of material fact exists with respect to what was commonly known about smoking since 1938. RJR relies upon the report of Dr. Martin, who holds a Ph.D. in history and teaches at the University of Houston. In that report, Dr. Martin answers these questions: (1) what was the extent of public awareness in the United States regarding the potential health risks associated with tobacco use and smoking cigarettes in the 19th and 20th Centuries; and (2) what was the extent of public awareness with regard to the "addictive" nature of smoking over the same period of time. *See* App. to Def.'s Mem., Ex. B, Tab 3, at 1. A summary of his report is as follows:

- Since the late 1800s, health education has been mandated in certain states and localities. Textbooks dating back to the early 1900s describe tobacco as habit-forming and a possible source of disease. *See id.* at 2.

- National anti-smoking organizations formed in the mid-to-late 19th Century and early 20th Century. They initiated widespread educational campaigns against smoking and stressed that smoking may be hard to quit once started. *See id.* at 2–3.

- In the late 1890s, Congress responded to a national petition drive to outlaw cigarettes by referring the issue to the states. Some states passed laws prohibiting sales of cigarettes to minors, and in some places to adults as well. After World War II, the federal government sponsored research addressing health and addiction issues related to smoking. Congress held hearings with widespread media coverage. Public health campaigns were initiated through the Surgeon General's office, the Public Health Service and other government agencies. *See id.* at 3–4.

- Recent lawsuits have garnered media attention. Even the Supreme Court in 1900 observed that Tennessee's decision to prohibit the sale of cigarettes was to protect public health. *See id.* at 4.

- *Reader's Digest* began covering smoking-related issues in the 1920s. Between 1900 and 1953, *Good Health Magazine* published articles about the relationship between smoking and various diseases and the possibility of premature death. *Good Housekeeping* warned of the addictive nature of smoking. *Time, Newsweek* and *Life* reported medical findings about the health risks associated with smoking. National, regional and local newspapers also reported medical studies beginning in the 1950s. *See id.* at 4–5.

- Books and pamphlets, including school textbooks, contained anti-smoking messages since the early part of the 20th Century. For example, Henry Ford published and distributed an anti-smoking pamphlet from 1914 to 1916. *See id.* at 5.

- Medical and medical-related research and writings have been made available to the public. In the 19th and early 20th Centuries, anti-smoking tracts described smoking in terms equivalent to habit-forming and addictive. They also described health-related problems. Between 1920 and 1950, research focused on smoking in relation to cancer and other health concerns. After 1950, the media extensively covered medical and scientific articles. In 1964, when the Advisory Committee to the Surgeon General released its report entitled *Smoking and Health*, the news media widely covered the report. *See id.* at 6–7.

- Television gave coverage to issues related to health and smoking beginning in the 1950s. In 1955, CBS featured on its show *See It Now* a segment on the medical-scientific debate over possible links between cancer and smoking. In 1957, CBS covered the Surgeon General's public announcement that an increasing body of evidence showed excessive cigarette smoking could cause lung cancer. Media attention also surrounded the 1964 report

from the Advisory Committee to the Surgeon General. *See id.* at 7.

- Slang expressions were created for cigarettes, such as "coffin nail" (late 1880s) and "coffin stick" (1920s). Expressions of this kind were used in books, movies, TV shows and music. *See id.* at 7.

- Dr. Martin believes the information about the health risks of smoking reached and was understood by the general public. He cites to the widespread circulation of magazines like *Reader's Digest*, national newspaper columns like "Dear Abby," and local newspaper columns that addressed the issue. In a 1954 Gallup poll, 90% of the respondents answered "yes" to the question of whether they had heard or read anything recently to the effect that cigarette smoking may be a cause of lung cancer. In a 1957 Gallup poll, following the release of a report by the American Cancer Society, 77% of the respondents said they had read or heard about the report. Among the respondents who were smokers, 82% answered "yes." Dr. Martin also points to the passage of anti-smoking legislation from the 1890s to the 1920s, and states that such legislative activity did not occur in a vacuum. He further notes that consumers' rapid shift to filtered cigarettes during the 1950s evidenced an understanding about the health risks of smoking. *See id.* at 8–11.

Although Plaintiffs refute none of this information, they discredit the Gallup polls by explaining that the respondents' answers showed only an awareness of a controversy about smoking, as opposed to knowledge that smoking causes cancer. *See* Aff. of Dr. Cummings, App. to Pl.'s Mem. in Opp'n to Summ.J., Tab 2, Ex. A, ¶¶ 15–18. Dr. Cummings further postulates that the concept of what constitutes a

"risk of smoking" is different today than it was in the 1950s. *See id.,* ¶ 19. A separate report submitted by Plaintiffs suggests that consumers do not truly appreciate the health risks of smoking. *See* Rep. of David J. Davin, M.D., App. to Pl.'s Mem. in Opp'n to Summ.J., Tab 4, Ex. B, at 5. This representation however, is based only upon Dr. Davin's experience with his own patients. *See id.*[13]

Plaintiffs' evidence fails to create a genuine issue of fact. Even ignoring the Gallup polls, RJR's report from Dr. Martin includes overwhelming amounts of evidence showing a public awareness of the health risks of smoking since the turn of the 20th Century. The *Tompkin* court reviewed the same kind of one-sided evidence and held that because no material factual dispute existed, a reasonable factfinder would be constrained by the evidence to find that the risks of smoking were common knowledge at the time the decedent began smoking in 1950. *See* 10 F.Supp.2d at 905.[14]

Having found that the risks of smoking were common knowledge in 1938 when Mr. Tompkins began smoking, RJR necessarily had no duty to warn under New York law.

### 3. Whether Plaintiffs can show that RJR's failure to warn prior to 1969 was the proximate cause of Mr. Tompkins' injuries

In the alternative, even presuming RJR had a duty to warn, Plaintiffs must show that the lack of proper warnings prior to 1969 was a proximate cause of Mr. Tompkins' injuries. *See Silveira Dias v. Marriott Int'l,* 251 A.D.2d 367, 368, 674 N.Y.S.2d 78 (2d Dep't 1998). RJR maintains that any alleged failure to warn could not have been a proximate cause because Mr. Tompkins' wife informed him of the

---

13. Significantly, Dr. Davin neither met nor treated Mr. Tompkins.

14. Two Courts of Appeals outside the Second Circuit have also found the risks of smoking

to have been common knowledge. *See Allgood,* 80 F.3d at 172 (common knowledge since 1936); *Roysdon v. R.J. Reynolds Tobacco Co.,* 849 F.2d 230, 236 (6th Cir.1988).

health risks since 1954. Yet he refused to quit smoking.

RJR's argument is flawed to the extent that it fails to account for the period of time between 1938 and 1954. Even so, Plaintiffs fail to point to any evidence that Mr. Tompkins would have quit, beyond his wife's claim that he would have stopped smoking if he had known that cigarettes were "really, really a hazard to a person's health." Yet at the same time Mrs. Tompkins made that statement at her deposition, she said her husband did not personalize the risks of smoking. *See* Dep. of Joann Tompkins, at 107. Dr. Cummings acknowledges in his report that "many smokers deny or diminish the personal relevance of these risks for themselves." See App. to Pl.'s Mem. in Opp'n to Summ. J., Tab 2, Ex. B, ¶ 6.14. If Mr. Tompkins never believed he would suffer from health problems caused by smoking, then no amount of warning would have induced him to quit. *Cf. Allgood,* 80 F.3d at 171–72 (dismissing fraudulent misrepresentation and concealment claims based in part on evidence from the plaintiffs' expert that the decedent "would have continued smoking absent an immediate and personal life threatening situation").

 Moreover, Plaintiffs have submitted no evidence to suggest Mr. Tompkins would never have started using cigarettes had he known the health risks at age 10. Nor is there evidence that Mr. Tompkins thought his wife's warnings lacked credibility. Plaintiffs' claim hinges on Mrs. Tompkins' deposition testimony, which is speculative at best about what kind of warning would have induced her husband to quit. Speculative evidence however, is insufficient to defeat summary judgment. *See Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999).

### D. Negligence

To sustain a negligence claim, Plaintiffs must prove the following elements: (1) RJR owed Mr. Tompkins a duty recognized by law; (2) RJR breached that duty; (3) a reasonably close causal connection

exists between RJR's conduct and Mr. Tompkins' resulting injury; and (4) Mr. Tompkins' suffered loss or damage as a result of the breach. *See McCarthy v. Olin Corp.,* 119 F.3d 148, 156 (2d Cir.1997) (applying New York law).

### 1. Whether Plaintiffs can prove negligent failure to warn

 New York courts consider a negligence claim for failure to warn and a strict liability claim for failure to warn to be equivalent. *See Fane v. Zimmer, Inc.,* 927 F.2d 124, 130 (2d Cir.1991) (citing *Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 62, 423 N.Y.S.2d 95 (4th Dep't 1979), *aff'd,* 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980)). For the reasons previously given with respect to the strict liability claim, Plaintiffs' claim for negligent failure to warn is dismissed.

### 2. Whether Plaintiffs can prove negligent misrepresentation

"One of the necessary elements of negligent misrepresentation is reliance." *Fane,* 927 F.2d at 130 (citing *Home Mut. Ins. Co. v. Broadway Bank & Trust Co.,* 53 N.Y.2d 568, 578, 444 N.Y.S.2d 436, 428 N.E.2d 842 (1981)). As noted in the analysis of Plaintiffs' claim for intentional misrepresentation and fraud, Plaintiffs fail to produce any evidence that Mr. Tompkins relied upon representations made by RJR in deciding to smoke. Mrs. Tompkins testified that her husband began smoking at the age of 10 "just for fun" and because his friends were smoking. *See* Dep. of Joann Tompkins, at 42–43. She also testified that cigarette advertising did not influence Mr. Tompkins' decision to smoke. *See id.* at 195–97. Moreover, one of Plaintiffs' theories underlying this lawsuit is that Mr. Tompkins could not quit, even when he tried, because of an addiction to nicotine. This evidence and approach to the case undermine any claim that Mr. Tompkins relied on statements or representations issued by RJR. Absent evidence of reliance,

Plaintiffs' cause of action for negligent misrepresentation necessarily must fail.

### 3. Whether Plaintiffs can prove negligent manufacture

The "essence of ... a [negligent manufacturing] claim is that a product did not perform as intended because it was misconstrued." *David v. Makita U.S.A., Inc.*, 233 A.D.2d 145, 145, 649 N.Y.S.2d 149 (1st Dep't 1996). The *David* court dismissed the plaintiffs' claim because they had not alleged that the product in question failed to perform in accordance with its design. *See id.*

Likewise, Plaintiffs do not allege that the Camel cigarettes smoked by Mr. Tompkins were defective when compared to the cigarette design. Camel cigarettes were designed to contain no filter. They were not intended to provide lower tar or to act as a "safer" cigarette. Accordingly, RJR is granted summary judgment in this regard.

### 4. Whether Plaintiffs can prove negligent design

A negligent design claim must establish that a feasible alternate design could have been used. *See Fane*, 927 F.2d at 130 n. 3 ("'In a design defect case the court is concerned with the balancing of the alternative designs available against the existing risk while taking into account the cost of the proposed alternative.'") (quoting *Lancaster Silo & Block Co. v. Northern Propane Gas Co.*, 75 A.D.2d 55, 62, 427 N.Y.S.2d 1009 (4th Dep't 1980)); *cf. David*, 233 A.D.2d at 146, 649 N.Y.S.2d 149 (sustaining negligent design claim in part because fact questions existed as to the feasibility of a safer design).

Yet as the Court noted with respect to the strict liability claim for design defect, Plaintiffs offer no proof of the feasibility of the alternate designs they advance. For the same reasons the strict liability claim fails, the negligent design defect claim must be dismissed.

### 5. Whether Plaintiffs can prove negligent testing

Plaintiffs elaborate little on what forms the underlying basis for this claim. They cite no case law in support of the cause of action, nor do they point to evidence beyond the expert report of Dr. Cummings. The report however, while it accuses RJR of hiding unfavorable results and refusing to incorporate processes that would have made cigarettes safer, indicates that RJR did in fact conduct tests on the safety of cigarettes. *See* Rep. of Dr. Cummings, App. to Pls.' Mem. In Opp'n to Summ.J., Tab 2, Ex. B, at ¶¶ 4.2–4.5.

Consequently, the Court finds no evidence to support a cause of action for negligent failure to test. Even if the Court were to find this particular negligence claim lends support to Plaintiffs' claim for negligent design, such a claim nevertheless must fail because Plaintiffs fail to show how the benefits of research would have made for a feasible alternate design. Moreover, as RJR suggests, the allegation that RJR should have done more to publicize its testing results might bolster a failure to warn claim. Yet again, that cause of action has been shown to be vulnerable on summary judgment.

### 6. Whether Plaintiffs can prove negligent sale

Neither party addresses the particulars of this claim. The only context in which negligent sale claims appear to be recognized is with respect to weapons such as firearms and bullets. The Court is unsure whether cigarette sales provide a comparable situation. Furthermore, Plaintiffs neither describe nor cite to evidence showing how they believe RJR acted negligently in selling cigarettes. Any criticism of RJR's advertising techniques would seem to be encompassed by Plaintiffs' (failed) misrepresentation or failure to warn claims. Therefore, the Court dismisses the claim on summary judgment.

### E. Breach of Express Warranty

#### 1. Whether Plaintiffs can prove breach of express warranty

 To prove breach of warranty, Plaintiffs must show that Mr. Tompkins relied upon a representation made by RJR and that the representation became part of the "basis for the bargain." *See Traub v. Cornell Univ.*, No. 94–CV–502, 1998 WL 187401, at *11 (N.D.N.Y. Apr. 15, 1998), *certification granted*, 1999 WL 224804 (N.D.N.Y. Apr.12, 1999).

With respect to the numerous advertisements contained in Plaintiffs' Appendix at Tab 1, Ex. M, N and O, the Court finds they make no representations as to the effects of smoking on one's health. Rather, they focus on Camel's mildness, flavor and energizing effect. They utilize movie stars, music stars, athletes and average Americans to sell Camel cigarettes. They note Camel cigarettes contain lower tar. Plaintiffs have not shown how such warranties were breached. Accordingly, Plaintiffs' breach of express warranty claim cannot rest upon these advertisements. *See Semowich v. R.J. Reynolds Tobacco Co.*, No. 86–CV–118, 1988 WL 123930, at *2 (N.D.N.Y. Nov. 15, 1988) (dismissing breach of express warranty claim because advertisements neither contained false information, warranted that Vantage brand of cigarettes were less harmful, nor suggested that Vantage cigarettes would have little or no negative impact upon a person's health); *see also Burton*, 884 F.Supp. at 1527–28 (citing *Semowich* in its dismissal of express warranty claims involving Camel cigarettes because the statements produced by the plaintiff contained no explicit statements or assertions about the health consequences of smoking).

Beyond the advertisements, Plaintiffs claim four other statements by RJR form the basis for an express warranty. The first is an article in the January 4, 1954 edition of the *Ithaca Journal*. *See* Pls.' App. to Mem. in Opp'n to Summ.J., Tab 1, Ex. P. It reports that a tobacco industry research committee was formed by cigarette manufacturers and tobacco groups to research the theory that cigarette smoking is somehow linked to lung cancer. The article quotes from an advertisement to appear in major newspapers that same day, which stated that the manufacturers believed "the products we make are not injurious to health."

The advertisement referred to is entitled "A Frank Statement to Cigarette Smokers." Significantly, this ad never appeared in full in the *Ithaca Journal*. *See* Def.'s Reply Mem. in Supp. of Summ.J., at 3 n. 3. Even presuming therefore, that Mr. Tompkins read the January 4, 1954 edition of that newspaper, he never saw the manufacturers' ad. Equally important, the newspaper article never identifies RJR as one of the cigarette manufacturers participating in the research group. As such, Mr. Tompkins had no reason to believe RJR made the statement that cigarettes were not harmful. Nor have Plaintiffs offered evidence that Mr. Tompkins read the entire advertisement in a different publication. Accordingly, no express warranty was created.

The second statement referred to by Plaintiffs is a 1963 pronouncement by RJR that it would stop selling its products if proved to be harmful. Yet Plaintiffs provide neither a copy of that statement nor information as to how or when Mr. Tompkins relied on it. Consequently, it cannot form the basis for an express warranty claim.

Plaintiffs next refer to a series of statements made by RJR's chairman of the board at a panel discussion on the television program *Nightline*, which aired February 2, 1984. The chairman is credited with saying the following: (1) "It is not known whether cigarettes cause cancer."; (2) "Despite all the research to date, there has been no causal link established [between smoking and emphysema]."; and (3) "... as a matter of fact, there are studies that while we are accused of being associated with heart disease, there have been studies conducted over ten years that

would say, again, that science is still puzzled over these forces." *See* App. to Pls.' Mem. in Opp'n to Summ.J., Tab 2, Ex. B, ¶ 6.9. These claims however, are not affirmative representations that cigarettes have no connection to health problems. Rather, they seem to have been intended to emphasize that no scientist could say for certain, at that time, that cigarettes were responsible for health problems. The chairman is not ruling out the possibility that such a link could be established, and never states that such a link would be impossible to make. Accordingly, nothing in these statements suggests RJR was warranting against any health hazards associated with its cigarette products.

Even if such a guarantee were to be implied, Plaintiffs still carry the burden of showing that Mr. Tompkins relied on these statements. They neither offer proof nor provide in their papers whether Mr. Tompkins saw this episode of *Nightline,* or whether he was made aware of the chairman's statements by other means. In fact, evidence of the chairman's statements is found only within Dr. Cummings' expert report. Without knowledge of the claims, Mr. Tompkins could not have relied upon them, and no breach of express warranty can stand.

Finally, Plaintiffs note that RJR's chief executive officer testified before Congress in 1994 and stated that "... cigarettes and nicotine clearly do not meet the classic definition of addiction." *See id.,* ¶ 2.9. Again however, Plaintiffs fail to explain how Mr. Tompkins would have become aware of this statement and relied upon it.

**F. Breach of Implied Warranty**

1. **Whether Plaintiffs' claims for breach of implied warranty are preempted by the Federal Cigarette Labeling and Advertising Act**

 As noted, the key question in deciding whether a claim has been preempted by the Federal Cigarette Labeling and Advertising Act is "whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion,' giving that clause a fair but narrow reading." *Cipollone,* 505 U.S. at 523–24, 112 S.Ct. 2608 (omissions in original).

RJR argues that Plaintiffs' breach of implied warranty claims are preempted under this analysis. According to N.Y.U.C.C. § 2–314, goods are merchantable if they:

a) pass without objection in the trade under the contract description;

b) in the case of fungible goods, are of fair average quality within the description;

c) are fit for the ordinary purposes for which such goods are used;

d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;

e) are adequately contained, packaged, and labeled as the agreement may require; and

f) conform to the promises or affirmations of fact made on the container or label, if any.

Plaintiffs allege in their complaint that Camel cigarettes were unmerchantable and unfit for safe use when sold and used as intended. *See* Pls.' Compl, ¶ 44.

The Court does not find that Plaintiffs' particular allegations relate to advertising or promotion. Plaintiffs fault the makeup of Camel cigarette products, not the information provided by RJR about them. Consequently, preemption is inappropriate. The New York State Supreme Court in New York County reached a similar conclusion in *Appavoo v. Phillip Morris Inc.,* No. 122469/97, 1998 WL 440036, at *3 (N.Y.Sup.Ct., N.Y.Cty., July 24, 1998) ("A breach of implied warranty of merchantability is based on the general warranty that a product is fit for use, and thus is independent of 'advertising or promotion.'").

RJR urges the Court to reject *Appavoo* because it lacks any analysis and has never been cited elsewhere. Yet the contrary opinions offered by RJR fare no better. For example, the court in *Geiger v. American Tobacco Co.*, 252 A.D.2d 474, 477, 674 N.Y.S.2d 775 (2d Dep't 1998), summarily concluded that the plaintiffs' claims for breach of implied warranty were preempted to the extent that they were based on a failure to warn or on the neutralization of warnings through advertising. While the Court does not disagree with this statement, it is inapplicable to the case at hand because Plaintiffs' breach of implied warranty claim is not grounded in the dissemination (or lack thereof) of information. In contrast, the causes of action in *Geiger* appear to have related completely to the dissemination of warnings and research results.

Likewise, the Southern District of Texas found claims for breach of implied warranty to be preempted where such claims were based on allegations that the defendants "(1) engaged in a conspiracy to negate the effects of studies that linked cigarette smoking with health hazards, (2) misled and confused the public about the health risks of smoking cigarettes, (3) concealed information about the harmful and addictive nature of tobacco use and/or nicotine, and (4) promoted and advertised their products so as to encourage the public to purchase and use cigarettes." *Perez v. Brown & Williamson Tobacco Corp.*, 967 F.Supp. 920, 928 (S.D.Tex.1997). Plaintiffs' claims in this case are different and therefore are not subject to preemption.

### 2. Whether Plaintiffs have established breach of implied warranty

█ RJR cites to this Court's decision in *Semowich* to show that a cause of action for breach of implied warranty must fail where the only allegation is that cigarettes are carcinogenic. The Court reasoned that because all cigarettes share the characteristic of being carcinogenic, no claim

for breach of implied warranty could stand on this basis alone. *Semowich,* 1988 WL 123930, at * 3. Plaintiffs neither address this precedent, nor defend the merits of this particular claim.[15]

The New York Court of Appeals has noted that a warranty of fitness for ordinary purposes "provides for a minimal level of quality." *Denny,* 87 N.Y.2d at 259 n. 4, 639 N.Y.S.2d 250, 662 N.E.2d 730 (internal quotation marks and citation omitted). Plaintiffs do not allege that Camel cigarettes were of inferior quality. Nor would a warranty of fitness require RJR to have fulfilled Mr. Tompkins' "every expectation." *Id.* (internal quotation marks and citation omitted). As such, and in the absence of evidence "showing that the product was not minimally safe for its expected purpose," *id.* at 259, 639 N.Y.S.2d 250, 662 N.E.2d 730, Plaintiffs' implied warranty claim is dismissed.

### G. Derivative Claims—Wrongful Death and Loss of Consortium

Since Plaintiffs' wrongful death and loss of consortium claims are derivative, the Court's decision to grant summary judgment to RJR on each of the underlying claims of injury to Mr. Tompkins necessitates that these derivative claims be dismissed.

### Conclusion

After carefully reviewing the entire record on appeal, the entire file in this matter, the submissions of the parties, the oral arguments of counsel and the applicable law, and for the reasons stated herein, it is hereby

ORDERED that Magistrate Judge DiBianco's order dated October 21, 1998 is AFFIRMED in its entirety, and the motion by Defendant R.J. Reynolds Tobacco Company for a protective order is DENIED; and it is further

ORDERED that the motion by Plaintiffs Joann Tompkins and Stephen G.

15. Rather, their brief addresses only breach of express warranty.

Tompkins to amend their complaint is DE-NIED; and it is further

ORDERED that the motion by Plaintiffs to strike affirmative defenses is DE-NIED; and it is further

ORDERED that the motion by Defendant for summary judgment is GRANTED in its entirety such that all of Plaintiffs' claims are dismissed; and it is further

ORDERED that the Clerk of the Court may close this case.